**Alfred RICCIUTI and Daniel Ricciuti, Plaintiffs,**

v.

**NEW YORK CITY TRANSIT AUTHOR-ITY, N.Y.C. Transit Police Depart-ment, N.Y.C. Transit Police Officer H. Lopez, Transit Police Lt. R.L. Wheeler, The City of New York, N.Y.C. Department of Corrections, N.Y.C. Corrections Commissioner Richard Koehler, N.Y.C. Corrections Officer Harlise Watson, Defendants.**

**Alfred Ricciuti and Daniel Ricciuti, Plaintiff,**

v.

**Francis O'Hare, individually and in his capacity as Captain of the N.Y.C. Tran-sit Police Department, Defendant.**

Nos. 90 Civ. 2823 CSH, 94 Civ. 141 CSH.

United States District Court, S.D. New York.

Sept. 15, 1999.

Opinion Denying Reargument Nov. 18, 1999.

Murphy & O'Connell, New York City (Kathleen O'Connell, of counsel), Henry & Regan, White Plains, NY (John V. Henry, of counsel), for plaintiffs.

Corporation Counsel, New York City (Patricia Miller, of counsel), for defendants Watson and O'Hare.

Thurm & Heller, New York City, for defendant Lopez.

Peltz & Walker, New York City (John O'Donnell, of counsel), for defendant Wheeler.

## MEMORANDUM OPINION AND ORDER

HAIGHT, Senior District Judge.

Following a jury verdict rejecting their claims, plaintiffs move for a new trial pursuant to Rule 59(a), Fed.R.Civ.P.

### I. *Procedural History*

This action arises out of an altercation outside Yankee Stadium on April 30, 1989 between plaintiffs Alfred Ricciuti ("Alfred") and Daniel Ricciuti ("Daniel"), and defendant Harlice Watson, an off-duty New York City Corrections Officer. The incident resulted in the arrest of plaintiffs. Following the disposition of criminal charges against plaintiffs, they asserted claims under 42 U.S.C. § 1983 and state law against Watson, several police officers, and (invoking *Monell* principles) the City of New York.

This Court granted defendants' motion to dismiss the complaint under Rule 12(b)(6) for failure to state a claim. The Court of Appeals reversed. *Ricciuti v. N.Y.C. Transit Authority*, 941 F.2d 119 (1991) ("*Ricciuti I*"). Following discovery, this Court granted defendants' motion for summary judgment under Rule 56. The Court of Appeals affirmed in part and reversed in part. *Ricciuti v. N.Y.C. Tran-*

*sit Authority*, 124 F.3d 123 (2d Cir.1997) ("*Ricciuti II*"). Familiarity with both opinions is assumed.

Trial of the surviving claims began before a jury on April 14, 1998 and concluded on April 29, when the jury returned a completed Special Verdict form. The defendants at trial were Watson, Transit Police Officer Henry Lopez, Transit Police Lieutenant Robert L. Wheeler, and Transit Police Captain Francis O'Hare.[1]

In summarizing the plaintiffs' claims against these four individual defendants, I will follow the order adopted for the Special Verdict submitted to the jury. Those claims were:

1. Daniel's claim against Watson for false arrest.

2. Daniel's claims against Lopez and Wheeler for failing to intercede when Watson arrested Daniel.

3. Alfred's and Daniel's claims against Wheeler for malicious prosecution.

4. Alfred's and Daniel's claims against Lopez, Wheeler, and O'Hare for violating their constitutional right to a fair trial.

5. Alfred's and Daniel's claims against Lopez, Wheeler, O'Hare, and Watson for conspiring to deprive him of their constitutional rights.

6A. Alfred's claims against Watson for assault and battery.

6B. Daniel's claim against Lopez for battery.

6C. Alfred's claim against Wheeler for libel.

These claims were set forth in the Liability section of the Special Verdict, comprising its first four pages. A copy of that section of the Special Verdict as completed

---

**1.** O'Hare was not a defendant at the times of the Second Circuit's opinions in *Ricciuti I* and *Ricciuti II*, and accordingly is not mentioned therein. Plaintiffs commenced a separate action against O'Hare after discovery, which was consolidated with the original ac-

tion for trial. The City and other individual defendants were not defendants at trial because this Court bifurcated trial of plaintiffs' claims against the individual officers from their *Monell* claims against the officers' municipal employers.

by the jury appears as Appendix A to this Opinion. The jury found for the defendant or defendants concerned on each of plaintiffs' claims.

Plaintiffs timely moved for a new trial under Rule 59(a).

## II. Standards for Granting or Denying a New Trial

Rule 59(a) provides: "A new trial may be granted ... for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States."

The Second Circuit has had several recent occasions to consider the standards for granting or denying a motion for a new trial under Rule 59(a). *See, e.g., DLC Management Corp. v. Town of Hyde Park,* 163 F.3d 124, 133–34 (2d Cir.1998):

> As a general matter, a motion for a new trial should be granted when, in the opinion of the district court, the jury has reached a seriously erroneous result or the verdict is a miscarriage of justice. A new trial may be granted, therefore, when the jury's verdict is against the weight of the evidence.... The standards governing a district court's consideration of a Rule 59 motion for a new trial on the grounds that the verdict was against the weight of the evidence differ in two significant ways from the stan-

dards governing a Rule 50 motion for judgment as a matter of law. Unlike judgments as a matter of law, a new trial may be granted even if there is substantial evidence supporting the jury's verdict. Moreover, a trial judge is free to weigh the evidence himself, and need not view it in the light most favorable to the verdict winner. A court considering a Rule 59 motion for a new trial must bear in mind, however, that the court should only grant such a motion when the jury's verdict is egregious. Accordingly, a court should rarely disturb a jury's evaluation of a witness's credibility. (citations and internal quotation marks omitted).

The cautionary note struck at the end of this discussion resonates with particular strength in the case at bar because, as we shall see, this is a quintessential "he said, he said" case, where the jury's resolution of the decisive facts necessarily depended upon their evaluation of which witnesses to believe.

■ The Second Circuit derives from *Tennant v. Peoria & Pakin Union Ry. Co.,* 321 U.S. 29, 35, 64 S.Ct. 409, 88 L.Ed. 520 (1944), the principle that "[a] jury's credibility assessments are entitled to deference." *United States v. Landau,* 155 F.3d 93, 105 (2d Cir.1998).[2] *See also Metromedia Co. v. Fugazy,* 983 F.2d 350, 363

**2.** In point of fact, the Supreme Court's decision in *Tennant* paints with a far broader brush than simple deference in upholding jury verdicts against judicial review. A railway switchman was killed during the moving of a train. There was no direct evidence as to his precise location at the moment he was killed. Accordingly plaintiff's theory of liability, that the engineer backed the train over decedent without first ringing the engine bell, depended upon an inference of causation to be drawn from the available evidence. The jury drew that inference in plaintiff's favor and returned a verdict against the defendant railroad. The Seventh Circuit held that the trial court should have entered a verdict in the railroad's favor. The Supreme Court reversed, reasoning that

> [i]t is the jury, not the court, which is the fact-finding body. It weighs the contradictory evidence and inferences, judges the

credibility of witnesses, receives expert instructions, and draws the ultimate conclusion as to the facts. The very essence of its function is to select from among conflicting inferences and conclusions that which it considers most reasonable. That conclusion, whether it relates to negligence, causation, or any other factual matter, cannot be ignored. Courts are not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable.

321 U.S. at 35, 64 S.Ct. 409 (citations omitted). If the evidence would allow a rational jury to draw a particular inference in a party's favor, "[n]o court is then justified in substituting its conclusions for those of the twelve jurors." *Id.* at 33, 64 S.Ct. 409.

(2d Cir.1992) ("Where the resolution of issues depended on assessment of the credibility of the witnesses, it is proper for the court to refrain from setting aside the verdict and granting a new trial."); *Dunlap–McCuller v. Riese Organization*, 980 F.2d 153, 158 (2d Cir.1992) (while on a motion for a new trial in an employment discrimination case the trial court may evaluate plaintiff's credibility, "we caution that the jury is empowered and capable of evaluating a witness's credibility, and this evaluation should rarely be disturbed.");[3] *Sorlucco v. New York City Police Dept.*, 971 F.2d 864, 875 (2d Cir.1992) ("The veracity of Sorlucco's statement concerning her signing of the blank form, and her knowledge (or lack thereof) of its effect on withdrawing the criminal charges against Mielko was a matter of credibility for the jury to resolve."); *Wade v. Orange County Sheriff's Office*, 844 F.2d 951, 955 (2d Cir. 1988) ("Since the jury was the trier of fact, its credibility assessments were entitled to deference, and the district judge properly refrained from setting aside the verdict and granting a new trial") (citing *Tennant*).

■ Where it appears that the district court failed to give the jury's credibility evaluations sufficient deference, an order granting a new trial will be reversed. *Sorlucco*, 971 F.2d at 875, is illustrative:

> All of the conflicting versions, if they were conflicting, were before the jury. The jurors heard both the testimony of Sorlucco on the point and that of Dr. Archibald, which tended to contradict it. They were free to settle upon which witness they believed. Under the circumstances, we think that the trial court overstepped its bounds and usurped the jury's function of judging credibility.

■ However, the fact that a jury's verdict depends in part upon its evaluation of a witness's credibility does not preclude the trial judge from granting a new trial under Rule 59(a). The Second Circuit made that plain in *Landau*, 155 F.3d at 104–106, a tax assessment case where the jury found the defendant in question, one Unger, liable. The jury clearly disbelieved

---

**3.** It is worth noting that in *Dunlap–McCuller* the Second Circuit held that "[a] district court order granting or denying a motion for a new trial on the grounds that a verdict is against the weight of the evidence is not reviewable in this Circuit." 980 F.2d at 157. In *dicta*, the *Dunlap–McCuller* court added: "On the basis of the cold record on appeal we would not have granted a new trial, because the grant of a new trial on weight of evidence grounds should be reserved for those occasions where the jury's verdict was egregious." *Id.* at 158. Since *Dunlap–McCuller*, Second Circuit law on the appealability of such orders has changed. It is now settled that a district court order granting a new trial on that ground is appealable, since in such a case "appellate review protects the role of the jury, as envisioned by the Seventh Amendment, rather than running contrary to it." *Binder v. Long Island Lighting Co.*, 57 F.3d 193, 201 (2d Cir.1995) (citations and internal quotation marks omitted). However, "where a district court denies a motion for a new trial made on the ground that the verdict was against the weight of the evidence, such a ruling is not reviewable on appeal." *Dailey v. Societe Generale*, 108 F.3d 451, 458 (2d Cir.1997) (citing *Stonewall Ins. Co. v. Asbestos Claims*

*Management Corp.*, 73 F.3d 1178, 1199 (2d Cir.1995)), *modified on rehearing*, 85 F.3d 49 (2d. Cir.1996).

In *Stonewall*, Chief Judge Newman explained why district court orders granting new trials on the ground that the verdict was against the weight of the evidence are appealable, while orders denying such motions are not:

> Reviewing a ruling on a "weight of evidence" challenge ... obliges a reviewing court to examine in some detail all of the evidence. That burdensome review is warranted in the rare case where a trial judge rejects a jury's verdict as against the weight of the evidence, as *Binder* held, but is not warranted in the far more frequent circumstance where a trial judge denies a "weight of the evidence" challenge and leaves in place a jury verdict supported by legally sufficient evidence.

73 F.3d at 1199. Chief Judge Newman's analysis of appealability reflects the Second Circuit's consistently expressed view that trial judges must approach "weight of evidence" motions for new trials with extreme caution, and grant them only in that "rare case" that may fairly be condemned as "egregious."

Unger's self-exculpatory testimony. "Since the only evidence Unger presented on his own behalf to establish that he did not exercise significant control was in fact was his own testimony, in finding against Unger, the jury must have rejected Unger's testimony." 155 F.3d at 105 n. 4. Unger moved for a new trial. The trial judge disregarded that specific request, set the jury verdict aside, and *sua sponte* granted Unger judgment as a matter of law ("JMOL"). The court of appeals reversed on the ground that the trial judge had disregarded Rule 50(b)'s stringent standards governing a post-trial JMOL.[4]

Unger argued on appeal that if the court of appeals reversed the JMOL in his favor, it should remand the case to the district court with instructions to grant a new trial. The court of appeals, choosing instead to "remand the case to the district court to determine whether Unger's motion for a new trial should be granted," 155 F.3d at 106, undertook to guide the district court on the standards it should apply, in language that I will quote at some length:

> [T]he fact that the jury's verdict was, as the Government contends, based in part on its evaluation of Unger's credibility does not preclude the district judge's grant of a new trial. It is inherent in the proposition that the district judge may weigh the evidence that the judge will consider the credibility of witnesses. . . . This is not to say that a district judge may freely substitute his or her assessment of the credibility of witnesses for that of the jury simply because the judge disagrees with the jury. A jury's credibility assessments are entitled to deference, and we have stated that where the resolution of the issues depended on assessment of the credibility of witnesses, it is proper for the court to refrain from setting aside the verdict and granting a new trial. However, these principles of deference

to the jury do not override the trial judge's duty to see that there is no miscarriage of justice. If convinced that there has been a miscarriage of justice then it is the trial judge's duty to set the verdict aside.

155 F.3d at 104–05 (citations and internal quotation marks omitted). After describing *Sorlucco*, 971 F.2d 864, where as noted a Second Circuit panel reversed the district court's grant of a new trial, the *Landau* court continued:

> *Sorlucco* illustrates the tension that exists when granting a motion for a new trial between two conflicting principles: the parties' Seventh Amendment right to a trial by jury and the power of the district court, also necessary to our jury system, to set aside a seriously erroneous verdict based on the weight of the evidence. This tension is most acute where, as in this case and in *Sorlucco*, the result may turn in large part on the credibility of a single witness. While this makes the trial court's task in ruling on a new trial motion more difficult, it does not preclude the possibility that the motion may be granted. In *Sorlucco*, the Court of Appeals found that the trial judge had disagreed with the jury on the credibility of a key witness but did not explain how that difference of opinion led to a miscarriage of justice. We do not read *Sorlucco* to mean that a trial judge can never substitute its view of the evidence for that of the jury, provided the judge is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice.

*Id.* at 105–06 (footnotes, citation and internal quotation marks omitted).

With all respect, *Landau*'s metronomic discussion more clearly describes the tension between conflicting principles than it furnishes the criteria by which trial judges should resolve that tension. Trial judges

---

4. Those standards include the principle that the trial court "cannot assess the weight of conflicting evidence, pass on the credibility of witnesses, or substitute its judgment for that of the jury." *Landau*, 155 F.3d at 100 (citation and internal quotations marks omitted).

are told that they must have faith in jurors' assessments of witnesses' credibility, but not too much faith. Such commandments might puzzle even theologians, but trial judges must make of them what they can. Trial judges are told that they must not substitute their evaluation of credibility for that of the jury, except that they must do so if a verdict based on credibility is a "miscarriage of justice," which trial judges are repeatedly cautioned they should find only very rarely[5] (although if the jury believed the wrong witnesses it is hard to see how their verdict could be characterized as anything else).

From this maze of conflicting principles and less than precise appellate directions, I fashion the following guidelines:

■ 1. A trial judge should be least inclined to disturb a jury's verdict, based entirely or primarily upon witness credibility, where the conflicting accounts of the witnesses are equally plausible (or implausible), and there is no independent evidence in the trial record clearly demonstrating that, if a miscarriage of justice is to be avoided, one party's witnesses should not be believed. In those circumstances, the trial judge should accept the jury's findings, regardless of any doubts of his own in the matter.

■ 2. Conversely, a trial judge should be most inclined to disturb a jury verdict, based entirely or primarily upon witness credibility, where one conflicting account is so inherently implausible as to tax credulity, or there is independent evidence in the trial record clearly demonstrating that to believe one party's witnesses over the other's would lead to a miscarriage of justice.

These guidelines are faithful to the core principle the Supreme Court declared in *Tennant*, 321 U.S. at 35, 64 S.Ct. 409, that

"[i]t is the jury, not the court, which is the fact-finding body," a principle the Second Circuit has consistently applied in witness-credibility cases and in broader contexts as well. *See, e.g., Bevevino v. Saydjari*, 574 F.2d 676, 685 (2d Cir.1978) (affirming denial of a new trial; "the district court was not required to grant a new trial simply because he disagreed with the jury."); *Compton v. Luckenbach Overseas Corp.*, 425 F.2d 1130 (2d Cir.1970). In *Compton*, the district judge denied defendant's motion for a new trial even though he had characterized the evidence against plaintiff as "overwhelming" and remarked that "as the trier of the fact he would have decided the case differently," 425 F.2d at 1133. Affirming, the Second Circuit said:

> The trial judge, exercising a mature judicial discretion, should view the verdict in the overall setting of the trial; consider the character of the evidence and the complexity or simplicity of the legal principles which the jury was bound to apply to the facts; and abstain from interfering with the verdict unless it is quite clear that the jury has reached a seriously erroneous result. The judge's duty is essentially to see that there is no miscarriage of justice. If convinced that there has been then it is his duty to set the verdict aside; otherwise not.

*Id.*

I will apply the principles of the cases discussed in this Part to the facts and circumstances of the case at bar.

### III. The Evidence Adduced at Trial and the Jury's Responses to the Special Verdict

In this Part of the Opinion, I will discuss the plaintiffs' claims in a different order than that appearing in the Special Verdict,

---

5. *Landau* does not depart from that principle. *See* 155 F.3d at 105 n. 3 ("a decent respect for the collective wisdom of the jury, and for the function entrusted to it in our system, certainly suggests that in most cases the judge should accept the findings of the jury, regardless of his own doubts in the matter.") (quot-

ing 11 Charles A. Wright, Arthur R. Miller & Mary Kay Kane, § 2806, at 74); *id.* at n. 4 (although the jury's rejection of a witness's testimony does not deprive the trial judge of the power to set aside the verdict, "it will be a rare occasion on which such action is justified.").

so that the chronology of events may be presented with maximum clarity.

The pertinent events took place, for the most part, at two locations: first, on a Bronx street in the vicinity of Yankee Stadium; and subsequently at a Transit Police district station underneath the subway station serving that area.

## A. *Alfred's Claims Against Watson for Assault and Battery*

### 1. *The Trial Evidence*

This case began with an altercation between Alfred Ricciuti, Daniel Ricciuti, and Harlise Watson which occurred during the afternoon of April 30, 1989, on 161st Street between River and Gerard Streets in the Bronx.

The parties agree that while Alfred and Daniel Ricciuti and Watson were walking on the 161st Street sidewalk, Alfred accidentally bumped into Watson; that Alfred and Watson exchanged punches; that one of Alfred's blows broke Watson's eyeglasses and cut him under his right eye; that during the altercation Watson's service revolver fell to the ground; and that Transit Officer Henry Lopez, who did not witness these events, thereafter arrested Alfred Ricciuti on Watson's complaint.

All other pertinent details are in dispute. The trial testimony of Alfred and Daniel gave one account of the incident. Watson's testimony, corroborated in certain aspects by that of Lopez, gave a fundamentally different account. These conflicting accounts cannot be reconciled. The jury accordingly was required to choose whether to believe the Ricciutis on the one hand, or Watson on the other. If the jury believed the Ricciutis, Watson assaulted Alfred. If the jury believed Watson, he did not.

### (a) *The Account Given by the Ricciutis*

Alfred and Daniel testified that during the afternoon of April 30, 1989 they had attended an afternoon baseball game at Yankee Stadium. Alfred is Daniel's uncle. He was 27 years old at the time of the incident in suit. Daniel was 22. The tickets had been given to the Ricciutis by a friend, and included passes into the Yankee Stadium Club, a limited access facility where refreshments may be obtained.

The Ricciutis drove to the Stadium from their homes in New Jersey. They parked their car in a nearby lot and were in their seats before the game began. They twice obtained food from Stadium vendors during the game. At the end of the game the Ricciutis went to the Stadium Club, where they each drank one beer. They testified that these were the only alcoholic beverages they consumed during the afternoon.

The Ricciutis left the Stadium and were walking away from it on 161st Street, on their way to the parking lot. They were conversing and not paying close attention to other pedestrians on the sidewalk. Suddenly and unexpectedly, Alfred collided with Watson, who was walking with his fiancee in the opposite direction. Neither Alfred nor Daniel had noticed Watson before this contact.

Watson, who was 27 years old at the time, is a relatively large man. He is taller, broader, and heavier than either Ricciuti. Alfred estimated Watson's weight as 220 pounds. Alfred testified that as he and Daniel were walking and talking, "obviously I was not looking in front of me, and I accidentally walked right into the chest of Mr. Watson," who Alfred described as "very big." [6] During the trial, plaintiffs' counsel had Watson and Alfred stand next to each other in front of the jury, in order to demonstrate their dramatic difference in size.

**6.** 4/15 Tr. 187, 188. Citations to the trial record indicate the date the testimony was given and the page of the transcript for that day ("Tr."). Transcripts for all trial days were submitted as exhibits to the declaration of Assistant Corporation Counsel Susan Emma Olick.

The Ricciutis testified that neither they nor Watson said anything at the moment of this accidental contact. The Ricciutis resumed walking away from the Stadium and Watson toward it (the Ricciutis did not recall that Watson was accompanied by a woman). Suddenly, Alfred testified, "Watson came back around to the front of me and stopped me from walking. He got right in my path." [7] Watson said to Alfred: "What are you, crazy? What are you going to do about this?" [8] Alfred assumed Watson was referring to the bumping. Alfred said to Watson: "I am sorry, let's just shake hands and we will go on our way," [9] and held out a placatory hand. Watson slammed Alfred's hand down with his on, and repeated: "What are you going to do about that?" [10] Alfred again extended his hand and asked to shake hands.

At that point, according to the testimony of both Ricciutis, Watson savagely assaulted Alfred. Watson shoved Alfred back several feet and then came at him with his hand upraised to attack. Alfred, acting in self-defense, punched Watson on the right side of his face. Alfred's one swing was followed by a barrage from Watson. Watson hit Alfred about 15 times, knocked Alfred down, bent down, grabbed him by the collar, and continued to hit Alfred. At this point Watson's service revolver fell out of his shoulder holster onto the pavement. Watson picked up his gun and pointed it at Alfred, within a foot of his face. Watson put his gun away, reached down and grabbed Alfred again by the collar, hit him 15 or 20 more times, then moved several feet away, pointed his gun again at Alfred, who was still lying on the ground, and left the area.[11]

Alfred said that Watson hit him "all over the upper part of my body, my face, my shoulders, my chest." [12] Watson left Alfred lying on the ground; Alfred described himself as "very dizzy, I was in a lot of pain, bleeding mainly in my mouth," having "trouble walking because of the beating I had just received." [13]

Daniel's testimony gave an identical account of how the altercation started, and the magnitude of the beating Watson inflicted upon Alfred. After Alfred struck Watson, Watson "just unloaded with devastating blow after blow after blow," landing "15 or 20 blows" on Alfred with a closed fist; Alfred fell; Watson punched Alfred "probably another good ten times" while Alfred was on the ground; Watson's gun fell out of his jacket and Watson pointed it at Alfred; Watson put the gun away, hauled Alfred to his feet, and continued to land "devastating punches" on Alfred, "maybe another five punches before Al went down again." [14] After Watson left, Daniel "helped [Alfred] off the ground and walked him across the street." Alfred "was beat up very badly. He couldn't walk on his own. I basically carried him across the street. I put his arm around my head and walked him as far as I could to the bank and left him there. Just really couldn't walk. He was very dizzy." [15]

### (b) The Account Given by Watson

Watson testified that as he and his fiancee were walking on the 161st Street sidewalk toward Yankee Stadium, he noticed "two gentlemen walking backwards coming towards us and they bumped into the two of us." [16] Watson, with whom Alfred had collided, asked Alfred in substance "what

7. 4/15 Tr. 187.

8. Id.

9. 4/15 Tr. 188.

10. Id.

11. This account is based on Alfred's testimony at 4/15 Tr. 190–196.

12. 4/15 Tr. 191–192.

13. 4/15 Tr. 196–197.

14. 4/14 Tr. 182–186.

15. 4/14 Tr. 189, 191.

16. 4/14 Tr. 67.

was wrong, what was the problem." Alfred responded: "I am not scared of you, nigger, let me go." [17] That epithet angered Watson. Alfred then punched Watson "in the glasses, he cut my face during that period." [18] This was the first blow of the altercation; Watson testified that he punched Alfred "because he punched me." Alfred "continued to punch me," maybe twice more; during the entire incident, Watson hit Alfred "maybe two or three" times.[19] At one point Alfred fell; Watson testified it was because Alfred was drunk.

When Watson's gun fell to the ground, Alfred was on the ground. Watson testified: "The gun fell, he was on the ground, one of them said, 'the nigger got a fucking gun.' He helped his buddy up and they ran." [20] Watson did not pursue them because "I was dazed, I was cut. I was hurt. I was in no condition to follow them up the block." [21] Watson and his fiancee returned to a neighborhood bakery they had visited earlier that afternoon; Watson described his purpose in doing so: "Maybe I could clean my wound, get something to use as a compress, call the police or whatever I was going to do." [22] Watson then observed Transit Police Officer Lopez, in uniform, walking in the area. Watson told Lopez that he had been assaulted, pointed out the Ricciutis to Lopez, and Lopez arrested Alfred Ricciuti.

Lopez's trial testimony implicitly corroborated Watson's account in one respect. While Lopez did not witness the beginning of the altercation, he testified that when Watson pointed the Ricciutis out to him, "I heard Alfred Ricciuti make a statement." According to Lopez, Alfred said: "You fucking nigger, I am going to kick your fucking ass." [23] When Watson identified Alfred Ricciuti as the one who had struck him, Lopez placed Alfred under arrest for assault, asked him to place his hands up against a wall, and handcuffed him. During that time, Lopez testified, Alfred was "yelling vulgarities"; Alfred's statements "were more in the form of vulgarities and racial slurs," those statements being directed "towards Harlise Watson mostly." [24] The racial epithets Lopez ascribed to Alfred Ricciuti are consistent with the epithets Watson testified Alfred directed toward him when their altercation began. Counsel for plaintiffs sought to cast doubt on Lopez's testimony on the point by cross-examining him by means of references to Lopez's prior deposition and the contemporaneous entries in Lopez's notebook.

The Ricciutis' trial testimony was that at no time did Alfred use any racial epithets, either when his altercation with Watson began, during Alfred's arrest by Lopez, or later in the station house to which Lopez brought him. As we will see, the hotly disputed issue of whether Alfred Ricciuti used racial epithets at various times runs like a *leitmotif* through this case. The resolution of that issue depended principally upon the jury's evaluation of the credibility of the several witnesses.

### 2. The Jury Verdict

Question 6A in the Liability section of the Special Verdict Form asked the jury if plaintiff Alfred Ricciuti had proved by a preponderance of the evidence that defendant Harlise Watson (i) assaulted him; or (ii) battered him. The jury answered "no" to both.[25]

17. *Id.*

18. *Id.*

19. 4/14 Tr. 75–76.

20. 4/14 Tr. 88.

21. 4/14 Tr. 89.

22. 4/14 Tr. 89.

23. 4/20 Tr. 203.

24. 4/20 Tr. 208–209. Lopez is Hispanic.

25. The Special Verdict did not record the jury's answer to Question 6A(ii), inquiring about the tort of battery. However, it is clear from the colloquy with the foreman of the jury after the verdict was handed up that the jury rejected both the assault and the battery claims.

### 3. *Discussion*

The reader will have observed that the Ricciutis' and Watson's accounts are diametrically opposed to each other. Alfred Ricciuti acknowledges that he struck Watson, but only in self-defense, and that Watson assaulted him. Watson acknowledges that he struck Alfred, but only in self-defense, and that Alfred assaulted him.

On the subject of self-defense, I instructed the jury:

> Defendant Watson has argued that he acted in self-defense. To prevail on his battery and assault claims, plaintiff Alfred Ricciuti must show by a preponderance of evidence that defendant Watson's actions were not justified by self-defense. Defendant Watson acted in self-defense if, one, he was under a danger or apparent danger of bodily harm at the time of the incident and, two, he used no more force than necessary to reasonably protect himself from such danger. If you find that plaintiff Alfred Ricciuti has failed to show that the defendant did not, in fact, act in self-defense, you must find that there was no battery or assault of Alfred Ricciuti.

4/27 Tr. 1244–1245. To this charge no objection was taken; and it is apparent from the jury's verdict that they believed Watson's account of the altercation and rejected that of the Ricciutis. The case furnishes a classically uncomplicated example of trial jurors resolving disputed factual issues on the basis of their assessment of the credibility of witnesses.

Nonetheless, plaintiffs contend that this is one of those rare cases where the trial judge, independently weighing the evidence under Rule 59(a), should disregard the jury's evaluations of credibility and arrive at a contrary conclusion. It is said in support of that contention that there is no reason to disbelieve the Ricciutis, while Watson's account should be rejected because the record exposes him as a perjurer. After careful consideration, I disagree on both counts.

As noted, Watson was much larger (and presumably stronger) than Alfred Ricciuti. Both Alfred and Daniel testified that Watson struck Alfred between 40 and 50 times with closed fists and great force ("devastating" in Daniel's phrase), landing his blows upon Alfred's upper body and unprotected face, thereby rendering Alfred bloody, in pain, dizzy and able to stand only with assistance.

But it seems remarkable, if one credits that testimony, that Alfred was not even more seriously injured, having been subjected to so prolonged a beating at the hands of so much larger a man—a difference in size which plaintiffs' counsel dramatized by arranging a lineup in front of the jury.[26] If plaintiffs' description of the prolonged and violent beating Watson gave Alfred is true, it is remarkable that Alfred

---

The Deputy Clerk: Section 6?
Mr. Foreman: Answer to both questions is no.
The Court: That is 6A1 and 6A2?
Mr. Foreman: Yes.
4/29 Tr. 1304.

**26.** One supposes that counsel's purpose was to suggest to the jury that a slight man like Alfred would not, if in his right senses, launch an assault upon a larger man like Watson: a proposition whose logic is undermined if Alfred was drunk at the time. There was evidence from which the jury could find that Alfred was intoxicated, despite his testimony, previously noted in text, that he and Daniel had consumed only one beer each during the entire day. Watson testified that both Alfred

and Daniel were "intoxicated"; ... "as they turned around, I could smell alcohol. Then I could see they were drunk," by "[t]heir mannerisms, glassy eyed look, the way they were talking, what he was saying." 4/14Tr. 86–87. Lopez, who arrested Alfred on the street on Watson's complaint, testified that Alfred "was a nasty drunk"; that he could "smell alcohol on his breath" and "some of his words were slurred." 4/20 Tr. 273–4. Wheeler included in a written report that at the station house Alfred had conceded that he "was a little drunk" at the time of the altercation. Alfred claims Wheeler fabricated that statement, a subject treated in detail *infra*. Alfred did acknowledge at trial that his driver's license had been suspended for six months for driving while intoxicated. 4/17 Tr. 111.

was not lifted off the sidewalk and taken to the nearest hospital trauma unit. In point of fact, however, following his arrest by Lopez, Alfred walked a number of blocks without assistance to the Transit Police station house underneath the 161st Street subway station.

While defendant Wheeler, the officer in charge of the Transit Police station house, summoned an emergency medical services ambulance crew to examine Alfred at 6:30 p.m. on April 30, the EMS personnel who responded found it necessary to do no more than treat Alfred "for a laceration of the right ring finger and contusion on forehead. Injuries did not require hospitalization." [27] That is a correct paraphrase of the Transit Police "Medical Treatment of Prisoner" form, defendants' Ex. F in evidence, which states in part: "Examination by attendant, minor edema to forehead, minor laceration to left ring finger, treated at scene. RMA" (which I take to mean "Refused Medical Assistance"). Alfred Ricciuti acknowledged that he signed that form, 4/17 Tr. 80–83, but I would not allow defendants' counsel to publish the form to the jury as a statement binding upon Alfred Ricciuti. *Id.* Tr. 84. However, in this Rule 59(a) context, it is appropriate to note that the form is consistent with Wheeler's report and with his testimony concerning the extent of Alfred's injuries. It is common ground that Alfred did not have to be treated at a hospital, either that evening or the following morning; in that regard he may be contrasted with Watson, who was taken to a hospital twice for treatment of the cut under his eye. During the first hospital visit, the emergency

room staff placed bandages upon the cut, but when the bleeding continued, Watson had to return to the hospital where the cut was stitched closed.

What all this comes down to is a basis for concluding that Alfred and Daniel Ricciuti materially exaggerated the extent to which Watson beat Alfred. The defendants make that point in their brief on the present motion. Plaintiffs argue in their reply brief that this is a false issue because Alfred charged Watson with assaulting him in general terms, not committing an assault in any particular degree as defined by the Penal Law. But that reply misses the point. Plaintiffs' material exaggerations of Watson's striking of Alfred, if found by the jury, go to the credibility of Alfred and Daniel generally. The same would be true if the jury thought plaintiffs had minimized their alcoholic consumption. The jury was given the traditional instruction with respect to the effect they could give to a witness's false statement. [28] I may reflect on such considerations in performing my evaluation of the trial evidence within the context of this Rule 59(a) motion.

Plaintiffs also urges the Court on this motion to conclude that Watson, Lopez, Wheeler, and O'Hare knowingly created false reports at the time of the incident, or gave false testimony at the trial, or both. Plaintiffs' contention, in short, is that the defendants obtained verdicts in their favor by perjury. I am asked to order a new trial on that basis.

In the context of Alfred's claim that Watson assaulted and battered him, the

27. Wheeler, 4/21 Tr. 549 (reading from his case notes).

28. I charged the jury on that point:

If you find that a witness has testified wilfully and falsely to any material fact, then you may reject the testimony of that witness entirely, or you may accept such parts or portions as commend themselves to a belief as credible, or which you may find corroborated by other independent evidence in the case. I am not saying that any such incidents occurred in this trial. That is for you to say. I am simply instructing you on how you may evaluate credibility.

You are at liberty, if you deem it proper under all the circumstances, to disbelieve a witness's testimony entirely, even though it was not otherwise impeached or contradicted; or, you may accept all or such part of his testimony as you deem reliable and reject such part of the witness's testimony as you deem unworthy of acceptance. 4/27 Tr. 1219–1220.

alleged perjury that I must consider is that of Watson. That follows from plaintiffs' contention that "[t]he jury's verdict that Alfred Ricciuti did not prove by a preponderance of the evidence that he was assaulted and battered by Corrections Officer Watson was against the weight of the evidence and could only have been based on perjured testimony by Office Watson." [29]

Before turning to plaintiffs' particular allegations of perjury by Watson, I will consider the burden of proof which plaintiffs must meet to sustain the charge. What follows will apply not only to the alleged perjury of Watson, but of the other defendants as well.

In *United States v. Dunnigan*, 507 U.S. 87, 94, 113 S.Ct. 1111, 122 L.Ed.2d 445 (1993), the Supreme Court said that a witness violates the federal criminal perjury statute, 18 U.S.C. § 1621, if a witness testifying under oath "gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." While in *Dunnigan* the Court applied that definition to a calculation under the United States Sentencing Guidelines, it observed that "[t]his federal definition of perjury by a witness has remained unchanged in its material respects for over a century," *id.*, and it is the definition that I will use for the present purposes.

In criminal prosecutions for perjury, the government bears the traditional burden of proving guilt beyond a reasonable doubt. The Second Circuit rule is that in the context of a civil action, perjury must be demonstrated by clear and convincing evidence. In *Barr Rubber Products Company v. Sun Rubber Company*, 425 F.2d 1114 (2d Cir.1970), a bench trial involving the validity of patents, the Second Circuit reversed as unsupported by the record the district court's finding of an intentional fabrication of evidence. The Second Circuit began its analysis by noting:

> Generally, a civil plaintiff must prove his affirmative case by no more than a preponderance of the evidence. Ordinarily this is true even where a criminal act is charged as part of a civil case.

425 F.2d at 1120 (citations omitted). Having said that, the court of appeals continued:

> However, there is ample authority of long standing that to substantiate charges of fraud or of undue influence, at least in actions seeking the recovery of monies paid or the rescission or cancellation of contracts, a litigant must present clear and convincing proof. When a person is charged with all the elements which constitute a heinous crime, although it be only on a civil issue, it shocks the judicial mind to refuse to give him the benefit of the usual presumption of innocence unless the adverse proofs are so far satisfactory as to be convincing.... Logic and reason demand that no lower standard of proof be applied in assessing a charge of perjury....

*Id.* at 1120–1121 (citations, footnote, and internal quotations marks omitted).

The Second Circuit adopted the same analysis in *Penthouse International, Ltd. v. Dominion Federal Savings and Loan Association*, 855 F.2d 963 (2d Cir.1988), in which it specifically reversed the district court's finding of perjury at the end of a bench trial. The court of appeals said:

> With regard to the perjury finding, we are somewhat surprised by its presence in the court's decision. If the court viewed Gorelick's testimony as incredible, that is its prerogative as the trier of fact in a non-jury case, but unless perjury is at issue in a case, such a finding is not necessary once the trier of facts

---

**29.** Affidavit of Kathleen O'Connell, trial counsel for plaintiffs, in support of present motion at ¶ 125.

finds the witnesses' testimony incredible. The perjury finding here, however, was not only unnecessary but also was erroneous since it was not based upon clear and convincing proof.

855 F.2d at 987 (citing *Barr*).

In *ICN Pharmaceuticals, Inc. v. Khan*, 2 F.3d 484 (2d Cir.1993), reviewing the propriety of a preliminary injunction where the district court said that he found a party's testimony "incredible, false and willfully false," the Second Circuit explicitly noted

> that a finding as to willfully false testimony (as distinguished from an ordinary credibility determination in the course of resolving a disputed issue of fact) must be made in stated accordance with the "clear and convincing proof" standard.

2 F.3d at 493 (citing *Penthouse* and *Barr*).

■ I think that this unbroken line of Second Circuit authority in civil trials applies to the trial judge's review of the evidence in the context of a motion for a new trial under Rule 59(a). While the jury in the case at bar was instructed to resolve the factual disputes under the preponderance standard, I am asked to grant plaintiffs a new trial on the ground that police officers perjured themselves. Perjury is a "heinous crime," surely not the less so if committed by a servant of the public such as a police officer; accordingly, if plaintiffs are to obtain a new trial on the ground that a defendant committed perjury, they must demonstrate that perjury by clear and convincing proof.

■ To revert to the testimony of Watson with respect to his altercation with Alfred Ricciuti, plaintiffs do not make that showing.

■ Plaintiffs begin their analysis of Watson's alleged perjury by summarizing plaintiffs' trial testimony about the altercation. As noted, plaintiffs' account of those events differs from that of Watson, but that is insufficient to demonstrate that Watson committed perjury. *See Bruneau*

*v. South Kortright Central School*, 962 F.Supp. 301, 304 (N.D.N.Y.1997):

> Furthermore, the plaintiff does not raise any evidence to establish that the student witnesses did actually testify falsely. In fact, the only thing which Bruneau can rely upon to support her contention is that she presented an entirely different version of the events which allegedly occurred at the School. Fact finding is, of course, the classic function of a jury. The jurors were presented with two opposing viewpoints and had within their powers of perception and reasoning the ability to weigh the testimony and determine the credibility of all of the witnesses, including the children who testified. It would be improper for this Court to usurp the jury's function of judging credibility.

(citations and internal quotation marks omitted). *See also Williams v. City of Newburgh*, 830 F.Supp. 770, 774 (S.D.N.Y. 1993) (Freeh, J.):

> Williams has also failed to present evidence that any witness lied or that the evidence presented was tainted in any way. While defendants' witnesses disagreed with Williams' version of events and interpretation of the parties' agreement, the existence of that disagreement does not necessarily mean that any witness perjured him or herself. Absent some other proof of the alleged lies, this argument also does not provide a basis for setting aside the jury's verdict.

In the case at bar, plaintiffs profess to find evidence of Watson's perjury in prior statements that he made concerning the incident. Specifically, on May 1, 1989, the day after the incident, Watson appeared before an Assistant District Attorney and signed a complaint against plaintiffs. On May 8, 1989, Watson submitted a written report about the incident to his employer, the Department of Corrections. On September 10, 1993, Watson gave a pre-trial deposition.

At the trial, plaintiffs' counsel confronted Watson with the complaint and his report to the Department of Corrections,

and read the text of those documents into the trial record. Counsel also quoted at length from Watson's deposition. Plaintiff perceives in these earlier declarations material discrepancies between them and Watson's trial testimony. Indeed, during summation plaintiffs' counsel directed the jury's attention to the contents of those prior statements as support for the proposition that "Watson's testimony is completely incredible." 4/27 at Tr. 1169 (an assertion that counsel followed immediately with references to Watson's deposition testimony and the contents of the criminal complaint and the report to the Department of Corrections).

It is true that there are some differences between Watson's trial testimony and his description of the incident in the prior declarations. Sometimes the difference is one of omission, that is to say, a failure to include in an earlier statement a detail testified to at trial. For example, in his statement to the Department of Corrections, Watson described how Alfred Ricciuti struck him, but did not state that Watson struck Alfred. Other discrepancies constitute a difference between the accounts. For example, during his trial testimony Watson denied that he had knocked Alfred down, ascribing Alfred's fall to the fact that he was drunk.[30] But at his deposition, Watson acknowledged having knocked Alfred down.[31]

While there are other differences or discrepancies between Watson's accounts that plaintiffs argued to the jury and reiterate on this motion,[32] I am unable to find in these discrepancies, perceived or real, clear and convincing proof that Watson gave perjured testimony at the trial. On

the contrary: were I to grant plaintiffs a new trial based upon my conclusion that Watson's trial testimony was perjurious, I would commit that reversible error identified by the Second Circuit in *Sorlucco v. New York City Police Department,* 971 F.2d at 864-75, where the district court granted the defendant's motion for a new trial "on the grounds that Sorlucco likely perjured herself at trial," a ruling the court of appeals condemned as an abuse of discretion:

> This is not a case where contradictory evidence subsequently comes to light revealing a perjury that would warrant a new trial. All of the conflicting versions, if they were conflicting, were before the jury. The jurors heard both the testimony of Sorlucco on the point and that Dr. Archibald, which tended to contradict it. They were free to settle upon which witness they believed. Under the circumstances, we think that the trial court overstepped its bounds and usurped the jury's function of judging credibility.

So in the case at bar, "all of the conflicting versions," derived from the trial testimony of plaintiffs and Watson, as well as from the accounts given by Watson at various earlier times, were before the jury and vigorously argued by counsel. Plaintiffs seek to distinguish *Sorlucco* on the ground that it did not involve any inconsistent factual statements by a party. That difference between *Sorlucco* and the case at bar may be acknowledged; but the effect *vel non* of a party-witness's prior declarations upon the credibility of his trial testimony traditionally falls within the province of the jury, under appropriate instructions

---

**30.** *See* 4/14 Tr. 74–75 ("Q. Did you knock him down? A. No. Q. Did he fall to the ground at any time? A. I think he did. Q. How did he fall? What made him fall? A. Well, I am not exactly sure, he was drunk, I noticed that. Q. He fell because he was drunk? A. Yes. Q. Is that correct, not because you hit him? A. No.").

**31.** *See* deposition testimony, read into the trial transcript at 4/14 Tr. 26 ("Q. How many times did you strike Alfred? A. I am not

exactly sure how many times. Q. More than once? A. Yes. Q. More than twice? A. Yes. Q. More than three times? A. I don't know. I don't know. I don't know if it was more than three. Q. Did you knock him down? A. Yes. Q. Did you strike him after he fell down? A. I think so, I am not sure.").

**32.** Watson's allegedly differing accounts on one aspect of the incident, Daniel's participation in the struggle between Watson and Alfred, are discussed in Part III(C) *supra.*

which I gave in this case.[33] Conceptually at least, I would not be bound by the jury's decision to believe Watson rather than the plaintiffs on this aspect of the case, if plaintiffs had demonstrated by clear and convincing evidence that Watson's testimony was perjurious. But plaintiffs have not sustained that burden.

It follows that on that aspect of the case relating to Alfred Ricciuti's claims against Watson for assault and battery, the jury was presented with two irreconcilable accounts, neither of which was inherently implausible. The jury resolved the decisive issues by evaluating the witnesses' credibility. I do not regard the jury's resolution of that claim as seriously erroneous, or resulting in a miscarriage of justice. I will not interfere with the jury's assessment of credibility because plaintiffs have not shown by clear and convincing proof that defendants obtained the verdict in their favor by means of perjured testimony.

### B. *Daniel's Claim Against Lopez for Battery*

 It is common ground that Transit Officer Lopez arrested Alfred Ricciuti on the oral complaint of Watson. Daniel Ricciutti, who had gone to get the car but observed his uncle being arrested, returned and protested that Lopez was arresting the wrong man. Lopez, persisting in his arrest of Alfred,[34] said he was taking Alfred to the 161st Street station house with Watson, and that Daniel could accompany them if he wished.[35] Daniel followed along behind.

Daniel's claim against Lopez for battery arises out of the Ricciutis' statements that as the four individuals were walking toward the station house, Lopez suddenly kicked his foot backwards and struck Daniel on the knee. Lopez denies having done so. The conflicting accounts on this very narrow issue were placed before the jury, which was asked in Question 6B of the Special Verdict Form: "Has plaintiff Daniel Ricciuti proved by a preponderance of the evidence that defendant Henry Lopez battered him?" The jury answered "no," indicating by that response that they believed Lopez and disbelieved the plaintiffs.

Plaintiffs challenge the jury's verdict on this claim as against the weight of the

---

**33.** *See,* fn. 28, *supra.* In addition, when plaintiffs' counsel first read to Watson from his deposition, I gave these instructions to the jury:

> A deposition is part of ordinary pretrial discovery procedures, and at a deposition the witness, in this case Mr. Watson, goes to an office and is placed under oath, and states that he will tell the truth, and the questions and answers are taken down by a stenographer just as our court reporter is recording those proceedings; and then at a trial, it frequently happens that counsel reads to a witness testimony that he or she has given at a prior occasion, like a deposition.
>
> You will find the facts in this case on the basis of the evidence that you hear, but it may be suggested to you, and you may have to consider, that there was a discrepancy, a difference between what a witness has said on an earlier occasion and what the witness says before you at trial.
>
> If that suggestion is made, you must decide first, whether or not there is any difference or discrepancy, and secondly, if there is,

> whether that difference is the kind which makes you consider in any way whether the testimony you are hearing in the trial should or should not be believed.
>
> Depositions may also be used to refresh recollection, but that's what a deposition is, and those are the uses to which the deposition may be put a trial.
>
> At the end of the day, your job will be to decide with respect to any witness whether or not what was said to you from this witness stand was or was not the truth, in whole or in part.

4/14 Tr. 84–85.

**34.** Alfred sued Lopez for false arrest, but the Second Circuit in *Ricciuti II,* 124 F.3d at 128, affirmed the grant of summary judgment to Lopez on that claim.

**35.** The parties refer to the Transit Police's underground facility as "District 11." The space served the purposes of a station house, with a booking desk and holding cells, and for the sake of clarity I will use that more familiar term.

evidence.[36] I think that the issue turns entirely upon the jury's evaluation of the witnesses' credibility, and in light of the authorities discussed *supra*, I decline to disturb the jury's assessment. I am not persuaded that the jury arrived at a seriously erroneous result or that its verdict is a miscarriage of justice. Accordingly I will not order a new trial on Daniel Ricciuti's claim against Lopez for battery.

## C. *Daniel's Claim Against Watson for Unlawful Arrest*

### 1. *The Trial Evidence*

It is common ground that Daniel, following Lopez, Alfred (now in Lopez's custody), and Watson, arrived at the station house shortly after they did. It is also common ground that Daniel was then arrested. The parties differed about who made that arrest.

### (a) *The Account Given by the Ricciutis*

Daniel and Alfred both testified that after entering the station house, Lopez brought Alfred to the booking desk, presided over by defendant Robert L. Wheeler, then a Transit Police lieutenant.[37] Watson stood at the desk to Alfred's right. Daniel stood against the wall. Daniel testified that Watson, Lopez, and Wheeler were having a discussion, but Daniel could not hear what they said. He could hear Alfred continuing to insist that he wished to press charges against Watson.

Daniel described what next occurred as follows:

A little, maybe five minutes after they had their conversation, Mr. Watson proceeded to turn around and look at me, looked right at me, and took me and spun me and threw me into this wall right here, and I asked him what he thought he was doing, and he told me I

was being put under arrest, and I asked Mr. Watson, for what, and Mr. Watson said for assault, and I said assault? I never committed a crime in my life, and Mr. Watson replied that's too fucking bad.

4/14 Tr. 203. Watson handcuffed Daniel and then "waited for Officer Lopez to come and take me into the cell," *id.*, which Lopez did. Lopez followed through on the arrests of both Alfred and Daniel, including conveying them to Central Booking; Watson, not an officer of the Transit Police, could not perform those functions.

Alfred's testimony agreed with Daniel's account of his arrest.

### (b) *The Account Given by the Defendants*

In their trial testimony, Watson, Lopez, and Wheeler all denied that Watson had arrested Daniel. According to their account, Lopez arrested Daniel on the order of Wheeler, after Watson identified Daniel as a participant in Alfred's assault upon Watson.

### 2. *The Jury Verdict*

Faced with these conflicting accounts, the jury had to decide whether Watson arrested Daniel (as Daniel contended), and, if so, whether Watson had probable cause for the arrest (which Daniel denied).

These issues were submitted to the jury in Questions 1A, 1B, and 1C of the Special Verdict Form. Question 1A asked if Daniel had proved by a preponderance of the evidence that Watson arrested him; if so, Question 1B asked if Watson had proved by a preponderance of the evidence that he had probable cause to arrest Daniel; and, if so, Question 1C asked the jury to specify for which offense or offenses probable cause existed to arrest Daniel.

---

**36.** While plaintiffs charge Lopez with having given perjured trial testimony on other aspects of the case, *see infra*, they do not seek a new trial of Daniel's battery claim against Lopez on that ground. *See* Plaintiffs' Reply Brief at 17.

**37.** After the merger of the Transit Police and the New York City Police Department, Wheeler was promoted to captain.

The jury answered Question 1A "yes"; Question 1B "yes"; and Question 1C by checking off, from a list of offenses, that of "attempted assault in the third degree." Accordingly judgment entered dismissing Daniel's claim against Watson for unlawful arrest.

### 3. *Discussion*

In finding that Watson arrested Daniel in the station house, the jury chose to believe the Ricciutis and disbelieved the testimony of Watson, Lopez, and Wheeler on that particular point. That evaluation of credibility contrasts with Alfred's claim for assault against Watson, where the jury believed Watson and disbelieved the testimony of the Ricciutis.

On this motion, plaintiffs argue that the jury's rejection of the defendants' account of Daniel's arrest brands Watson, Lopez and Wheeler as unworthy of belief or perjurers in everything else that they said, so that plaintiffs are entitled to a new trial on all their claims. There is no substance to this argument. Defendants could urge with equal force that, because the jury disbelieved the Ricciutis' account of the assault on Alfred, they should be disbelieved in everything else that *they* said. Neither extreme would be justified. The jury did no less, but no more, than exercise its traditional option to believe parts of a witness's testimony and disbelieve other parts, thereby declining to apply what one court has called "the always treacherous maxim *falsus in uno, falsus in omnibus.*" *Phillips v. Crown Central Petroleum Corp.*, 556 F.2d 702, 705 (4th Cir. 1977).

I see no reason to reject the jury's assessment of the witnesses' credibility on the particular issue of who arrested Daniel. Presumably Watson, Lopez, and Wheeler were not gratified by the jury's finding that Watson arrested Daniel, despite their denials that he did so; but had those defendants challenged that finding as against the weight of the evidence, they

would have enjoyed no more success than the plaintiffs have in challenging the jury's finding that Alfred assaulted Watson, and not the other way around.

So plaintiffs' motion for a new trial on this claim comes down to whether Watson had probable cause to arrest Daniel. Plaintiffs stress that Watson did not articulate any reasons why he arrested Daniel, and of course that is true, since Watson denied that he arrested him at all. But Watson's stated reason for arresting Daniel is found in Daniel's description of the incident, which the jury clearly accepted. According to Daniel, Watson said that he was arresting him for "assault." In those circumstances, the Special Verdict Form, without objection from any party, asked the jury to consider whether Watson had probable cause to arrest Daniel for one or more of the following offenses: assault in the second degree; assault in the third degree; attempted assault in the second degree; attempted assault in the third degree; and aggravated harassment in the second degree. As noted, the jury specified attempted assault in the third degree. I must ask whether that verdict is legally permissible.

Plaintiffs say it is not, and for two reasons: on the trial evidence, the verdict was against the weight of the evidence or, in the alternative, erroneous as a matter of law.

These contentions require us to return to the street outside Yankee Stadium, and consider again the altercation between Alfred Ricciuti and Harlise Watson, this time focusing upon whether and to what extent Daniel Ricciuti participated in it.

Plaintiffs' motion papers accurately summarize the Ricciutis' testimony as being that "Daniel said nothing, did nothing and never touched Watson at all during the incident."[38] The picture they painted was one of Daniel rooted to the spot in silent terror.

---

**38.** Affirmation of Kathleen M. O'Connell, Esq., at ¶ 25.

Watson's account was that Daniel made contact with him, in an attempt to prevent Watson from defending himself against Alfred. Thus Watson testified: "we [Alfred and Watson] exchanged a couple of punches, the other one [Daniel] tried to hold my arm back"; [39] "as I attempted to swing at one gentleman [Alfred], the gentleman [Daniel] grabbed my arm in an attempt to stop me from defending myself," grabbing Watson's left arm (his punching arm) "below the elbow"; [40] Daniel's "holding my arm trying to get a grasp on my arm" while Watson was swinging his arm may have caused Watson's gun to fall to the ground.[41]

Plaintiffs' examination of Watson on this point made it clear that Daniel's participation in the altercation was ineffectual. Thus Watson testified that "Daniel couldn't get a grip" on his arm, he "didn't really hold it"; while Daniel "tried to grab it," he "never really had a grip on my arm," and only touched it "for a couple of seconds." [42] While the day after the incident Watson signed a criminal complaint stating that "Daniel Ricciuti held your deponent's arm as defendant Alfred Ricciuti punched your deponent in the face repeatedly," he acknowledged during his trial testimony that Daniel "didn't get hold of me." [43] Daniel failed in his effort to hold Watson's arm while Alfred was punching Watson "only because I wouldn't let him get a firm grasp"; Daniel failed in his

effort to hold Watson's arm during that period "because I wouldn't let him." [44]

Daniel's conduct, Watson testified, prompted Watson to identify Daniel to Wheeler at the station house as "the other gentleman that participated in the assault," when Daniel "held my arm" and "tried to" grab Watson to "prevent me from defending myself." [45]

■ Watson testified, in sum, that as Alfred was punching him, Daniel tried to "grab" or "hold" the arm Watson was using to fight back in an effort to prevent Watson from defending himself, but Watson was able to shake Daniel off. The jury was entitled to accept Watson's testimony. Indeed, it is clear from their verdict that they did so. Moreover, this testimony justifies the jury's verdict that probable cause existed to arrest Daniel for attempted assault in the third degree. Their specification of that offense demonstrates the care with which the jury, having been instructed on the elements of all the offenses, weighed the evidence. Assault in the *second* degree, either the substantive offense or an attempt, would not have been viable because of the statutory definition of "serious physical injury," an element of that crime. But the crime of *attempted* assault in the *third* degree was made out by the facts as described in Watson's testimony, under the instructions that without objection I gave to the jury.[46]

**39.** 4/14 Tr. 67.

**40.** *Id.* Tr. 92.

**41.** *Id.* Tr. 96–97.

**42.** *Id.* Tr. 93–94.

**43.** *Id.* Tr. 149.

**44.** *Id.* Tr. 149.

**45.** *Id.* Tr. 113–114.

**46.** I charged the jury in pertinent part:

A person commits the crime of assault in the third degree when, one, with intent to

cause physical injury to another person he causes such injury to such person; ... "Physical injury" means impairment of physical condition or substantial pain. As to the crime [ ] of ... attempted assault in the third degree, a person is guilty of an attempt to commit a crime when, with intent to commit a crime, he engages in conduct which tends to effect the commission of such crime.

In the case at bar, the jury was entitled by the evidence it credited and by the law to conclude that where Alfred's first blow broke Watson's glasses and cut his face, Daniel's efforts to participate in Alfred's continuing assault furnished probable cause to arrest Daniel for attempted assault in the third degree.

I will not direct a new trial of Daniel's claim against Watson for unlawful arrest. The legality of Watson's arrest of Daniel also justifies the jury's refusal to reach Daniel's claims against Lopez and Wheeler for failing to intercede in that arrest.[47]

### D. Alfred's and Daniel's Claims Against Wheeler for Malicious Prosecution

Alfred and Daniel Ricciuti were each charged with assault in the second degree and aggravated harassment in the second degree. Those charges were ultimately dismissed. Both plaintiffs asserted claims against Wheeler for malicious prosecution with respect to these two charges. The jury found that both plaintiffs had failed to prove either claim.

Specifically, plaintiffs were charged with violating N.Y.Penal L. § 120.05(1), which provides that a person is guilty of assault in the second degree when "[w]ith intent to cause serious physical injury to another person, he causes such injury to such person or to a third person." "Serious physical injury" is defined as "physical injury which creates a substantial risk of death, or which causes death or serious and protracted disfigurement, protracted impairment of health or protracted loss or impairment of the function of any bodily organ." N.Y.Penal L. § 10.00(10).

Plaintiffs were also charged with violating N.Y.Penal L. § 240.30(3), which provides that a person is guilty of aggravated harassment in the second degree when "with intent to harass, annoy, threaten or alarm another person, he ... [s]trikes, shoves, kicks, or otherwise subjects another person to physical contact, or attempts to do the same because of the race, color, religion or national origin of such person."

█ To prevail on a claim of malicious prosecution, a plaintiff must prove each of these four elements: "(1) the defendant initiated a prosecution against plaintiff, (2) without probable cause to believe the proceeding can succeed, (3) the proceeding

was begun with malice and (4) the matter terminated in plaintiff's favor." *Ricciuti II*, 124 F.3d at 130.

In the case at bar, it was undisputed that both charges against plaintiffs were terminated in their favor, thereby satisfying the fourth element. It was also undisputed that Wheeler initiated the assault in the second degree prosecution against plaintiffs, since it was he who specified that charge in the documentation forwarded to the office of the Bronx district attorney. Accordingly, with respect to plaintiffs' claims against Wheeler for maliciously prosecuting them for assault in the second degree, the trial turned upon the second and third elements: whether Wheeler had probable cause to believe that a prosecution for assault in the second degree could succeed; and whether he began that prosecution with malice.

With respect to the charge of aggravated harassment in the second degree, the first element was in dispute, as well as the second and third. That is because this charge was added by the assistant district attorney who received the file from the station house and processed the case.

I will discuss the two charges separately.

#### 1. Assault in the Second Degree

█ Plaintiffs clearly established the second element of their malicious prosecution claim for assault in the second degree. Wheeler did not have probable cause to believe that a prosecution on that charge could succeed. As noted, the charge required the existence of a physical injury so serious that it "creates a substantial risk of death or serious and protracted disfigurement, protracted impairment of health or protracted loss or impairment of the function of any bodily organ." N.Y.Penal L. § 10.00(10). Watson's most serious injury was a cut under his eye. A reasonable

**47.** *See* Questions 2A and 2B in the Special Verdict Form.

jury could not find that injury sufficiently serious to meet the statutory definition.

The case therefore turns upon the third element, whether Wheeler began the proceeding "with malice." The Second Circuit stated in *Ricciuti II*, 124 F.3d at 131, that "lack of probable cause generally raises an inference of malice sufficient to withstand summary judgment," citing *Lowth v. Town of Cheektowaga*, 82 F.3d 563 (2d Cir.1996) for that proposition. In *Lowth* the Second Circuit, reversing summary judgment in the defendant police officer's favor on plaintiff's claim of malicious prosecution for resisting arrest, stated that "[i]n most cases, the lack of probable cause—while not dispositive—tends to show that the accuser did not believe in the guilt of the accused, and malice may be inferred from the lack of probable cause." *Id.* at 573 (citation and internal quotation marks omitted). "Under New York law, malice does not have to be actual spite or hatred, but means only that the defendant must have commenced the criminal proceeding due to a wrong or improper motive, something other than a desire to see the ends of justice served." *Id.* (citation and internal quotation marks omitted). The *Lowth* court concluded:

> Given that Officer Grant lacked probable cause to charge Mrs. Lowth with resisting arrest, and given also that it is certainly not implausible that Officer Grant might have been acting out of anger for what Mrs. Lowth put him through, we think that enough evidence of malice, as defined by New York, can be inferred to survive a motion for summary judgment.

*Id.*

In the case at bar, the jury rejected plaintiffs' claims for malicious prosecution after full plenary trial, during which Wheeler gave an explanation for his second-degree assault charges.

On that issue, Wheeler testified in response to questions by defense counsel:

Q: Do you recall testimony earlier today about the time that you first saw Officer Watson and viewed his injury?

A: Yes, sir, I do.

Q: And at the time did you classify it as serious physical injury?

A: Yes, sir. He had an eye injury, and I consider any eye injury to be serious, sir.

Q: And at a later time, did you consider what the appropriate charges were?

A: Yes, sir, I did.

Q: And what charge did you find to be appropriate with respect to the situation involving the plaintiffs in this case?

A: Assault second degree, sir.

Q: And could you explain your reasoning to the Court and jury?

A: Well, sir, Mr. Watson had sustained an eye injury. It has the potential for detaching the retina, cornea damage, permanent loss of vision. We returned him—he came back from Montefiore Hospital and the bandage they applied to his wound was still bleeding. And I believe we heard testimony that when he went back the second time, they removed glass from that wound. And in my mind, that constitutes serious physical injury.

4/22 Tr. 691–92.

Wheeler's counsel argued to the jury in summation:

> Captain Wheeler has some experience with how individuals are hurt in a physical altercation. He told us that recruits at the police academy were told not to strike people in the eyes because that can cause a very serious injury. Additionally, as some of the jurors may appreciate better than I, a blow to the eye to someone that is wearing glasses is even more significant. Captain Wheeler has told us that he has some paramedic training and some experience in evaluating people who have been injured. He told us that, even today he believes that he had reasonable cause, probable cause,

to charge the crime of serious physical injury.

It makes no difference that two or three or four months later that the person was lucky. The decision that has to be made has to be made before the prisoner is sent to central booking. In this case, we know that Mr. Watson went to Montefiore Hospital because the wound was continuing to bleed, and there is the suggestion that the wound was actually getting larger.

I think that I can argue to you that Captain Wheeler's decision is appropriate, but the law doesn't even require that. *The law only requires that he didn't make those charges on a bad faith basis.* And you, ladies and gentlemen, have to wonder why, out of all the people that get arrested and come before Lt. Wheeler as a desk officer, would he bear any animus towards these two individuals? Why? He doesn't know Officer Watson. There has been testimony they don't know each other. They haven't seen them before or after.

4/27 Tr. 1104–05 (emphasis added).

Counsel's last argument squarely raised the issue of Wheeler's malice; and, with respect to the malice element of plaintiffs' malicious prosecution claims, I charged the jury without objection:

> The third element of a malicious prosecution claim is that the proceeding was begun with malice. Malice does not have to be actual spite or hatred, but means only that a defendant commenced the criminal proceeding due to a wrong or improper motive, something other than a desire to see the ends of justice served. You may infer malice if you find that probable cause was so totally

lacking that no reasonable officer could have thought it existed.

4/27 Tr. 1236.

 I think it is clear that the jury accepted Wheeler's explanation, concluded that he had not acted "with malice" in beginning the proceedings against plaintiffs for second-degree assault, and rejected plaintiffs' malicious prosecution claims on that charge for failure to prove that separate and necessary element. While a jury may infer malice from a lack of probable cause, that lack is "not dispositive" of the malice issue, *Lowth,* 82 F.3d at 573; and a jury is free, on the basis of a defendant's explanations for his actions or other evidence in the case, to find a lack of malice, notwithstanding a lack of probable cause. It is reasonable to assume that the jury in the case at bar did precisely that.[48]

 Given those realities, plaintiffs' contention that the jury verdict is fatally inconsistent because it found Watson had probable cause to arrest Daniel Ricciuti for third-degree assault, and not second-degree, misses the mark. A claim for false arrest turns upon whether there was probable cause for the arrest. Malice is not an element of false arrest. Thus there is no inconsistency between the jury's finding that probable cause to arrest Daniel existed only with respect to third-degree assault, and a finding that Wheeler did not act with malice in leveling the more serious charge against plaintiffs.

Plaintiffs argued to the jury, and argue again on this motion, that Wheeler's malice toward them must also be inferred from two documents in evidence. The first document is an "On Line Booking System Arrest Sheet," Def. Trial Ex. M, a form prepared at a police station house after an

---

**48.** The special verdict form did not require the jury to state its findings separately with respect to each of the four elements of the malicious prosecution claims. But plaintiffs did not object to that form, and accordingly cannot complain of the propriety of the verdict analysis set forth in the text. *See Pha v. Trueblood, Inc.,* 915 F.2d 764, 769 (1st Cir.

1990) (even if special interrogatories to a jury placed parties "on notice that there might be an inconsistent verdict," the party detrimentally affected waives any objection to the verdict form by not raising issue prior to verdict, since parties cannot "lie in wait and ask for another trial when matters turn out not to their liking.") (citations omitted).

arrest and forwarded as part of the arrest file to the District Attorney's office when the accused is transferred from the station house for further processing at Central Booking. It is common ground that Wheeler filled out this form. The second document is an unsigned one-page typed document on New York Transit Police Department stationery, Pl. Trial Ex. 1C, captioned "BIAS INCIDENT," and quoting an interview at the station house of Alfred Ricciuti by Wheeler, during which interview (according to the document) Alfred said to Wheeler, *inter alia,* "I was walking down the street and I bumped into this nigger," and conceded being "a little drunk at the time." Wheeler acknowledged during his trial testimony being the author of that document. The trial evidence strongly suggests that this document was included in the arrest file given to the District Attorney, since during discovery the document was found in the District Attorney's file, and there is no evidence to indicate that it was given to the District Attorney at a later time.

Plaintiffs further argued to the jury, and argue again on this motion, that these documents are false and perjurious, thereby supporting an inference of Wheeler's malice. Plaintiffs contend that the On Line worksheet is false because it charges them with a violation of Penal Law § 120.05(1), assault in the second degree, and identifies Lopez as the "arresting officer" for Daniel as well as Alfred Ricciuti. Plaintiffs contend that the "Bias Incident" report is false because Wheeler never interviewed Alfred Ricciuti, so that the statements attributed to Alfred in that report are fabrications.

While the Bias Incident report pertains more directly to plaintiffs' claim against Wheeler for malicious prosecution for aggravated harassment, any fabrication by Wheeler of that document would be generally probative of his possible malice against plaintiffs with respect to the assault charge as well. Accordingly I consider these documents together under this subheading of the opinion.

Plaintiffs' perceived falsity of the On Line sheet stems from their contentions that no probable cause existed for charging them with assault in the second degree, and that Watson, rather than Lopez, arrested Daniel Ricciuti in the station house. As appears from the Special Verdict form, the jury accepted both those contentions, but nonetheless found that plaintiffs failed to prove Wheeler acted maliciously. I consider the On Line sheet in that context.

First, Wheeler's act in charging plaintiffs with second degree assault does not compel an inference of malice if the jury accepted Wheeler's explanation for making that particular charge, which the jury was entitled in law to do and seems to have done.

As for Wheeler's identification of Lopez as the "arresting officer" of Daniel, the jury's verdict is contrary to that characterization, since it found that Watson arrested Daniel. However, Daniel also testified that after Watson handcuffed him, Watson "waited for Officer Lopez to come and take me to the cell," a function incident to Daniel's arrest which Lopez promptly performed. Lopez was thus directly involved in Daniel's arrest and detention, and was the only police officer in the station house who could be so characterized. When one considers that the On Line worksheet begins with the *printed* caption "Arresting Officer Information," and that Watson was not a Transit Police officer, it made more sense for Wheeler to identify Lopez as Daniel's "arresting officer" than to leave the space blank.

I appreciate that there is no testimony by Wheeler in the trial record that he reasoned in this fashion, since the defendants' theory of the case was that Lopez, not Watson, initiated as well as completed Daniel's arrest. But in reviewing the evidence to determine if the jury's verdict was egregiously wrong, I may consider whether a plausible explanation for a docu-

ment's contents exists other than deliberate falsehood. Such an explanation exists with respect to the identity of the arresting officer in the On Line worksheet.

As for the Bias Incident report, Alfred and Daniel Ricciuti testified at trial that Wheeler never interviewed Alfred at the station house, and that the statements ascribed to Alfred are fabrications by Wheeler. Wheeler testified at trial that Alfred made those statements to him. Lopez testified that he heard Alfred make the statements to Wheeler while Alfred and Wheeler were together in a cell and Lopez was in the muster room next door, although he did not record them in his notebook.

In summation, plaintiffs' counsel argued to the jury that the perjury of Wheeler and Lopez on this point was made manifest by their prior answers to interrogatories and depositions.[49]

Plaintiffs reiterate that contention on this motion, culling from the record on discovery the prior testimony of Wheeler and Lopez that they argue demonstrates the transparent perjury of these witness's trial testimony. *See* Affidavit of plaintiff's counsel at ¶¶ 88–99 (contrasting Wheeler's discovery testimony with his trial testimony); ¶¶ 100–113 (contrasting Lopez's discovery testimony with his trial testimony). Plaintiffs' counsel say on this motion that they "demonstrated that Wheeler's trial testimony was perjured by showing the jury that Lt. Wheeler and [*sic;* probably should be "had"] made several prior inconsistent sworn statements denying that he took any statement from Alfred Ricciuti."

*Id.* at ¶ 88. Comparable contentions are made with respect to the perceived perjury of Lopez; *see, e.g., id.* at ¶ 111 ("As to his prior testimony that Alfred made no statement which was not recorded in his notebook, Lopez [*sic* ] explanation that he had not recorded it in his notebook at the time because he was not 'directly involved' in the interview is patently incredible on its face.").

On this motion, plaintiffs also argue that the perceived perjury of Wheeler and Lopez as to Alfred's statements to Wheeler "clearly prejudiced plaintiffs since they were unable to effectively meet this new 'evidence' regarding material facts and clearly warrants a new trial." Affidavit of plaintiffs' counsel at ¶ 76. That additional argument is made for the first time on this motion; plaintiffs did not ask for a continuance or a mistrial when Wheeler and Lopez gave the trial testimony in question. The argument is phrased thus in Plaintiffs' Reply Brief at 18–19: "Moreover, inconsistent deposition testimony as to material facts are also grounds for a new trial, even where perjury is not alleged when the inconsistent testimony is prejudicial to one of the parties." For that proposition plaintiffs cite two Fourth Circuit cases, *Phillips v. Crown Central Petroleum,* 556 F.2d 702 (4th Cir.1977), and *Twigg v. Norton Company,* 894 F.2d 672 (4th Cir.1990).

On the issue of Alfred's statements to Wheeler, plaintiffs' counsel cross-examined Wheeler and Lopez extensively on the basis of their prior testimony during discovery; and there is a certain inconsistency

---

**49.** Plaintiff's counsel argued to the jury:

Officer Lopez testified at his deposition in 1993 that if Alfred Ricciuti had made any statement regarding the incident with Officer Watson, he would have recorded that statement in his notebook. And his notebook contains no mention of any statement made at 5:25 or any other time by Alfred Ricciuti which even remotely resembles this 100-word confession created by Officer Watson [*sic;* counsel probably intended to say "Lt. Wheeler."] . . . .

Lt. Wheeler also provided a sworn interrogatory answer in 1993 in which he stated

that he attempted to interview Alfred Ricciuti as to his health and his pedigree, but Alfred Ricciuti's answers were not responsive, and then he made no written memorandum of anything Alfred might have said to him.

Nonetheless, at this trial, Lt. Wheeler recanted that testimony and testified that not only did Alfred Ricciuti contest [*sic;* probably should read "confess"] he assaulted Officer Watson, making racial slurs in making the confession.

4/27 Tr. 1192–1193.

between plaintiffs' first argument, that the prior testimony clearly revealed Wheeler and Lopez to the jury as perjurers, and their second, that counsel were taken by surprise and "were unable to effectively meet" the same trial testimony. In any event, I shall consider these two arguments in inverse order.

The Fourth Circuit cases plaintiffs cite, while arriving at unremarkable conclusions, bear no meaningful resemblance on their facts to those of the case at bar.

In *Phillips*, an antitrust action brought by three plaintiff retail gasoline dealers against a wholesaler and owner of retail stations, the district court conducted a bench trial, entered numbered findings of fact and conclusions of law, and granted the plaintiffs injunctive relief in the form of station leases for an additional three years. Thereafter, during his post-merits trial deposition on damages issues, one of the plaintiffs, Tumminello, admitted directly and through counsel that he had committed perjury and falsified a document in his pre-trial deposition and at the merits trial resulting in the injunction. Defendant asked the district court to reopen the hearing on the merits so that Tumminello could be examined on all aspects of his prior testimony. The district court struck the particular finding of fact implicated by the perjury and the fabrication, but refused to hold a hearing or lift the injunction, reasoning that "the false testimony and the false exhibit of plaintiff Tumminello were no more than cumulative." 556 F.2d at 705. The court of appeals held that the district court's refusal to hold a hearing was error:

> The District Judge and we know that on a vital matter Tumminello, according to his own and the other plaintiffs' counsel, has committed perjury. Just how pervasive was that perjury, neither the judges nor the parties other than Tumminello can know. It is possible that large parts of the intricate web of findings may be affected. It is possible that the perjury was limited, and that there

remains a solid structure for the injunction. One must hear before one decides. *Id.*

Thus plaintiffs materially overstate *Phillips* when they say that the district court was reversed "for its failure to order a new trial, where it was established that one of the plaintiffs had committed perjury in both deposition and trial testimony." Reply Brief at 18. The plaintiff's perjury in *Phillips* was "established" not by contentions of opposing counsel comparable to those at bar, but by the express admission of the perjurious plaintiff himself. At the trial of the instant case, Wheeler and Lopez adhered to their accounts in the face of energetic cross-examination, and presumably do so to this day. And the court of appeals in *Phillips* did not order a full plenary new trial; the district court was directed to inquire further into the pervasiveness of the admitted perjury, at the end of which the injunction might be permitted to stand.

*Phillips* has nothing to do with unfair and prejudicial trial surprise, the proposition for which plaintiffs cite it. *Twigg*, their second case, does, but again the facts are materially different.

In *Twigg*, a railroad worker sued the B & O Railroad, his employer, and the Norton Company, the manufacturer of a track grinding device that broke while plaintiff was using it, injuring him. From the first pleadings, through discovery, pre-trial orders, plaintiff's counsel's opening statement to the jury, and the testimony of plaintiff's expert, plaintiff's theory of liability was and remained that the grinding stone was defective, shattering as soon as it was applied to the track. Only on cross-examination did plaintiff for the first time suggest that the machine lacked an extended protective guard and that lack caused his injury.

The jury gave plaintiff a verdict for a considerable sum. The court of appeals, ordering a new trial, reasoned as follows:

During the course of oral argument before this court, counsel for the appellees [plaintiffs] agreed that Twigg's trial testimony, which was contrary to that given during his deposition, came as a surprise and that such a shift in position likely prejudiced B & O. We believe that under these particular circumstances B & O is entitled to a new trial. . . .

[S]urprise does not warrant a new trial unless it deprives the party of a fair hearing. . . . Here, there is little doubt, as the appellees concede, that the assertion of a new theory of liability mid-trial resulted in actual prejudice to B & O. The result was that B & O was not given an opportunity to satisfactorily prepare to rebut the assertion that the machine itself was defective by either positively showing the existence of the protective guard or by showing by way of expert testimony that the equipment was appropriate for the use for which it was employed, with or without the protective device.

894 F.2d at 674–675.

*Twigg* differs from the case at bar in two respects. First, the plaintiff's trial account of the mechanical cause of his injury was flatly contradicted by his deposition testimony. Here, the prior testimony by Wheeler and Lopez, allegedly inconsistent with their trial testimony, consisted in the main of asserted failures to recollect what they were then able ("miraculously," in plaintiffs' sarcastic phrase) to remember at trial. Those contrasts in testimony furnished legitimate grist for the cross-examiner's mill, and laid the foundation for the argument plaintiffs' counsel made to the jury that the trial testimony should be disbelieved. And therein lies the second difference between *Twigg* and the case at bar.

In *Twigg,* as the court of appeals stressed, when in mid-trial plaintiff changed his technical theory of the mechanics of the accident, the defendant was precluded from finding an expert witness to testify on a subject lying beyond the knowledge of a lay jury. In the case at bar, armed with what they perceived to be prior inconsistent testimony with respect to facts which were not technical in nature, plaintiffs' counsel were in a position to (and did) challenge the truth of Wheeler's and Lopez's trial testimony, thereafter inviting the jury in summation to brand these witnesses as perjurers. Plaintiffs' counsel do not reinforce their conclusory assertion that they could not effectively meet this trial testimony with any specific suggestion of what else they might have done. The fact is that the prior statements of these witnesses gave plaintiffs' counsel a quiver-full of arrows to shoot, and they shot them all. Plaintiffs' difficulty is that they did not persuade the jury.

They did not persuade the jury—and now I come to the first of plaintiffs' two arguments on the issue—presumably because the jury accepted Wheeler's extended testimony seeking to reconcile his various declarations, and his counsel's argument in explanation of such discrepancies that existed between his client's prior testimony and trial testimony.[50]

---

**50.** Counsel for Wheeler argued in part:

Captain Wheeler came to court and he withstood cross-examination concerning his lack of recollection of that statement four years after the event. And because this was a routine matter in the workings of a police department, he had no recollection of it at that time. We have spent more time in this courtroom than any of the police officers ever did who were involved in this case. . . . So, think about the memos you wrote five years ago. And if somebody deleted your name and somebody handed it to you, and

it was a matter of no particular significance, one of the hundreds of arrests that you've reviewed, at a time when you are no longer working in that duty assignment and have gone on to do other interesting things, and somebody presents this memo to you, and says, is this yours, what would your natural response be? . . . . And after listening to all of the testimony in this courtroom he comes up here on this stand, does he say it's somebody else's fault? No. He says yes, that's my memo. Yup, it is. And he explained to you how it

Had I been a trial juror, these explanations might or might not have satisfied me. But that was not and is not my function; and while under Rule 59(a) I may weigh the evidence myself, the factual questions posed by the Bias Incident report turn entirely upon the credibility of the witnesses, an area where the Second Circuit cautions district judges against intrusion.

Moreover, since plaintiffs charge Wheeler and Lopez with perjury in respect of this document, and Wheeler with perjury in respect of the On Line worksheet, plaintiffs were required to prove that perjury by clear and convincing evidence. When I consider plaintiffs' evidence in the light of that burden, and with that deference owing to the jury's evaluation of the credibility of the witnesses, I am unable to conclude that the documents in question and the defendants' testimony concerning them sufficiently demonstrate defendant Wheeler's malice against plaintiffs so as to entitle plaintiffs to a new trial.

### 2. Aggravated Harassment in the Second Degree

This analysis of malice *vel non*, in the context of plaintiffs' claims against Wheeler for malicious prosecution for assault, is also sufficient to dispose of the companion claims of malicious prosecution for aggravated harassment.

However, there is an additional basis for denying a new trial on the aggravated harassment charge. Plaintiffs were required to prove, as the first element of their malicious prosecution claim against Wheeler, that Wheeler "initiated a prosecution against plaintiff[s]" on that charge. *Ricciuti II*, 124 F.3d at 130. I do not think that the evidence justifies a finding that plaintiffs established that element.

In *Ricciuti II*, 124 F.3d at 130, the Second Circuit considered this element in the context of the record created on discovery. The court of appeals said:

> Here, with regard to the first element, a jury could clearly find that Lt. Wheeler started the assault prosecution by filing the charges of second-degree assault. A jury could also find that Lt. Wheeler was *instrumental* in bringing about the charges of second-degree aggravated harassment. Although these charges were added by the Bronx district attorney's office, and thus not directly filed by Lt. Wheeler, a jury could find that Lt. Wheeler *played a role* in initiating the prosecution by preparing the alleged false confession and forwarding it to prosecutors (emphasis added).

I interpret this language to mean that the Bias Incident report prepared by Wheeler must have been a proximate cause of the district attorney's lodging the harassment charge against plaintiffs. I think it is a "but for" proposition; that is to say, if the jury could find from the trial evidence that the district attorney would have charged plaintiffs with harassment even if the Wheeler document had not existed, plaintiffs failed to prove the first element.

That the jury could lawfully so find appears clearly from the trial testimony of Thomas Oliva, an attorney now in private practice, but on the evening of April 30, 1989 a Bronx Assistant District Attorney assigned to that office's Criminal Court Bureau. On that evening Oliva was performing "in-take in the complaint room" where "cases first came in"; the purpose of the in-take unit:

> is to start in, if you will, from the District Attorney office's point of view, and this is generally because, there are exceptions to this but generally with respect to the complaint room, it would

was created, and why he no longer remembered it when he was deposed years later. And he was cross-examined about an affidavit and he was cross-examined about an interrogatory response where he says no, I

didn't talk to this guy. But after the passage of time, we all forget details. But then, when we go back and we pull out all of our memory banks, we remember more. 4/27 Tr. 1118–1120.

start the ball rolling in terms of the prosecution of a defendant.

There would be folders made up by the clerks there with the police on-line booking sheet inside of it. Sometimes complainants were there, complainants were involved in a case. If it was things like narcotics, undercover buy-and-busts, police officers involved in the case would be there, and we would interview either the officers or the witnesses or the victims of the incidents, and see whether or not there was probable cause to go forward, and start in essence the ball rolling.[51]

Given the passage of time, Oliva understandably had no specific recollection of what would have been for him a routine procedure. But he was enabled to testify about his participation in the Ricciuti case by the District Attorney's file, Pl.Ex. 1A–1K, and the Criminal Court file, Pl.Ex. 2A–2M, the contents of which were placed before Oliva by plaintiffs' counsel during the trial.

Oliva's handwritten case summary, Pl. Ex. 1A, shows that on May 1, 1989, he interviewed Harlise Watson, identified as "C/W" (the complaining witness). Since it was not recorded, one cannot tell the hour of the interview. At about that date the in-take unit abandoned its midnight to 8:00 a.m. shift. The most that can be said is that Oliva interviewed Watson less than 24 hours after the incident. Also on May 1, Watson signed a sworn felony complaint on a form prepared by the District Attorney's office. Pl.Ex. 1D (unsigned copy); Pl.Ex. 2C(1) (signed copy). On the basis of what Watson told him, Oliva inserted in the complaint the charges that plaintiffs had violated "(F) P.L. 120.05(1) Assault 2d," and "(M) P.L. 240.30(3) Aggravated Harassment."[52] The on-line booking sheet prepared by Wheeler and forwarded from the station house to the District At-

torney's office contained only one charge, that of assault in the second degree; Oliva added the aggravated harassment charge on his own initiative. Thus he testified:

Q. The second charge there, was that a charge that you added?

A. Well, it's not on the on-line booking sheet, so it's quite possible, based on my interview with the victim, that yes, I added that charge.[53]

While Oliva's lack of present recollection understandably prompted him to speak in terms of possibilities, the contemporaneous documents make it clear that in fact he added the aggravated harassment charge against plaintiffs.

The complaint form sets forth Watson's statement to Oliva as follows:

Deponent states that, at the above time and place, was [sic] beaten by the defendants acting in concert, to wit; defendant Alfred Ricciuti punched your deponent in the face causing your deponent's glasses to shatter, cutting your deponent's eye causing a jagged wound requiring nine stitches to cheek and substantial pain.

Deponent further states that the defendant Daniel Ricciuti held your deponent's arm as defendant Alfred Ricciuti punched your deponent in the face repeatedly and defendant Alfred Ricciuti kept calling your deponent a nigger who he was not afraid of.

The racial slurs recounted to Oliva by Watson on May 1 are further reflected in Oliva's handwritten case summary, which reads in part:

C/W ["complaining witness"] was walking to bakery when defendant Alfred walking backwards bumped into the C/W despite C/W's attempt to avoid the defendant. Defendant Alfred turned around and stated in substance what's

---

**51.** 4/17 151–153.

**52.** "(F)" indicates a felony charge, and "(M)" a misdemeanor.

**53.** 4/17 Tr. 162.

wrong with you nigger, and fuck you, I'm not afraid of you, nigger.

Oliva's summary also contains this notation:

C/W flagged down A/O [presumably "arresting officer" Lopez] and pointed out defendants standing a block away. A/O approached and heard defendant Alfred yell you fucking nigger I'll kick your ass.[54]

On his case summary form, Oliva also checked the "yes" box under the printed caption "did defendant make statement," and then wrote under the caption "substance of statement":

Defendant Alfred S & S[55] I was walking down the street and bumped into this nigger. I said I was sorry but I was a little drunk and I don't back down from anybody.

Following that statement, Oliva added the bracketed phrase "[typed sheet]". This was undoubtedly a reference to Wheeler's Bias Incident report, which contains the same language and was found in the District Attorney's file.

We come now to the decisive question, previously identified: what caused Oliva to add the aggravated harassment charge? On that subject, responding to plaintiffs' counsel, Oliva testified:

Q. Is it possible that, based on your knowledge of the statement, that was made to you or you were told about, the defendant's statement, that you added that charge, the one pertaining that [*sic*] racial epithet?

A. Well, there were two racial epithets from what I—in reading this that I see. There was one that was made to the victim himself, and then there was a typed statement, *so it could have been either or both* based on the typed statement *or what he actually told the victim at the time* that that charge would have been based on.[56]

Perhaps wisely, plaintiffs' counsel did not ask Oliva the follow-up question of whether Oliva would have added the aggravated harassment charge if the typed statement had not existed, leaving Oliva with only the account of Alfred's racial epithets given to him by the victim, Watson (probably corroborated by Lopez, the arresting officer). Nor did counsel for Wheeler pursue the point. The best that can be said for plaintiffs on this evidence is that maybe the typed statement was "instrumental" or "played a role" in causing Oliva to add this charge, but maybe it did not. The jury would have been entitled to regard these alternatives as equally *possible;* but to find that plaintiffs had *proved* a causal connection between the typed statement and Oliva's addition of the charge, the jury would have been required to go beyond what Oliva himself testified, thereby engaging in impermissible speculation.

Accordingly, even if (contrary to my previously expressed conclusion) the jury was not entitled to find Wheeler's conduct free of malice toward plaintiffs, the evidence would not have allowed the jury to find that Wheeler initiated the prosecution of plaintiffs for aggravated harassment.[57] That furnishes an alternative reason for

---

**54.** It is not stated in the documents in the files or Oliva's testimony whether Oliva also interviewed arresting officer Lopez on May 1, but it seems likely that he did. Lopez was the officer who transported the Ricciutis from the station house to Central Booking, and delivered the police file to the District Attorney's in-take unit. Oliva acknowledged that he might have gotten an oral communication from the arresting officer. 4/17 Tr. 161. The statement Oliva's case summary ascribes to the "A/O" is consistent with Lopez's trial testimony, that when Watson pointed the Ricciutis out to him, Lopez heard Alfred say, "you fucking nigger, I am going to kick your fucking ass." 4/20 Tr. 203.

**55.** "S & S" is legal shorthand for the "sum and substance" of the statement immediately following.

**56.** 4/17 Tr. 162 (emphasis added).

**57.** It is worth noting that Oliva's trial testimony was not before the Second Circuit when that court considered the matter on summary judgment in *Ricciuti II.*

denying plaintiffs' motion for a new trial on that claim.

### E. *Plaintiffs' Remaining Claims*

For the foregoing reasons, I conclude that the jury verdicts in the defendants' favor on the plaintiffs' claims previously discussed derive principally from the jury's evaluations of the parties' credibility; the verdicts are not contrary to the weight of the credible evidence; plaintiffs have failed to demonstrate by clear and convincing evidence that any defendant perjured himself; and plaintiffs have failed to demonstrate to the Court that the verdicts brought about a miscarriage of justice.

Plaintiffs' remaining claims, derivative in nature from those previously discussed, also fail to support a motion for a new trial. No extended discussion is necessary.

■ Plaintiffs claimed that Lopez, Wheeler, and Transit Police Captain Francis M. O'Hare violated their constitutional rights to a fair trial. On those claims, I charged the jury without objection:

> Both plaintiffs next claim that defendants Wheeler, Lopez and O'Hare violated their constitutional right to a fair trial by fabricating and distributing to prosecutors a false confession attributed to Alfred Ricciuti. When a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial. The harm occasioned by such an unconscionable action is redressable in an action for damages under Section 1983. You must consider each plaintiff's claim that his right to a fair trial has been violated separately.[58]

That charge adopted the language of the Second Circuit in *in Ricciuti II*, 124 F.3d at 130, the court of appeals going on to observe on the record then before it:

> Here, a reasonable jury could find, based on the evidence, that defendants Lopez and Wheeler violated the plaintiffs' clearly established constitutional rights by conspiring to fabricate and forward to prosecutors a known false confession almost certain to influence a jury's verdict.

*Id.*

Having considered the far more comprehensive record generated by a full plenary trial, the jury, responding to separate questions, rejected the claims of both plaintiffs. In doing so, the jury evidently rejected the plaintiffs' factual premise for those claims, which again compels the conclusion that the jury accepted the testimony of Wheeler and Lopez as credible and rejected the testimony of plaintiffs. For the reasons stated in the discussion of the malicious prosecution claims, *supra*, a reasonable jury was entitled to make that evaluation, and I deny a new trial on these claims as well.

■ The trial evidence revealed no viable claim against Transit Police Captain O'Hare, the third defendant named in these claims. At the time O'Hare's duties included the investigation of possible bias crimes. He came to the station house in response to a telephone call that the incident involving the Ricciutis might be so characterized. Wheeler had prepared a two-page typed report, the previously discussed remarks attributed to Alfred forming the second page of that document. Wheeler gave his report to O'Hare for the latter's assistance. O'Hare's report reflects the contents of Wheeler's report. Assuming *arguendo* (and contrary to the jury's findings) that the remarks Wheeler attributed to Alfred were fabricated, no basis appears in the evidence for imputing knowledge of their falsity to O'Hare.

■ Again assuming *arguendo* that the statements attributed to Alfred Ricciuti were fabrications, the jury's verdict in defendants' favor cannot be characterized as a miscarriage of justice for an additional

---

58. 4/27 Tr. 1237.

and alternative reason. While such a fabrication would, as the Second Circuit held, amount to a constitutional violation by the police involved, plaintiffs proved no actual damages resulting from it. The likely adverse influence the fabrication would have upon a hypothetical jury trying the accused on a charge of aggravated harassment, which properly concerned the Second Circuit in *Ricciuti II*, did not come to pass, because both charges against plaintiffs were dropped prior to trial. The Ricciutis were held in detention for the night and required to come back to Bronx Criminal Court several times before both charges were dropped; but there is no proof that the same would not have been required if the accompanying charge of assault in the second degree had stood alone; and the alleged fabrications relate primarily to the aggravated harassment charge.[59]

While plaintiffs have contended that Wheeler deliberately avoided appearing in court on the aggravated harassment charge, and the Second Circuit was moved on the record then before it to say that "[a]ll charges were dismissed by a pre-trial court order on July 13, 1989, after Lt. Wheeler, despite numerous adjournments, failed to appear to testify in support of the 'confession,'" *Ricciuti II*, 124 F.3d at 127, Wheeler testified at trial that he never received a notice from the District Attorney's office through the Transit Police bureaucracy that he was required to appear in court, 4/22 Tr. 630–633, there was no contradictory evidence, and the jury was entitled to believe Wheeler.

**59.** *See Ricciuti II*, 124 F.3d at 126 ("The statement contained in this memorandum found its way verbatim into several subsequent investigation reports prepared in connection with the bias investigation, and apparently based largely upon this statement, the assault was classified as bias-related.").

**60.** On the conspiracy claims, I charged the jury without objection that Alfred Ricciuti could not recover for conspiracy "unless you find that he has proven by a preponderance of

In these circumstances, even if the statements attributed to Alfred had been fabricated, plaintiffs proved no consequent actual injury, and would have been limited to nominal damages of $1 each (assuming without deciding that Daniel would have any claim for fabricated statements attributed to Alfred alone). *See Carey v. Piphus*, 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978).

For reasons that require no further discussion, plaintiffs' claims that Lopez, Wheeler, O'Hare, and Watson conspired to deprive them of their constitutional rights,[60] and Alfred's claim against Wheeler that the statements falsely attributed to him were defamatory, fare no better on this motion.

## IV. *Conclusion*

Its verdicts as reported on the Special Verdict form make manifest the jury's almost unbroken line of decisions to believe the several defendants' testimony and disbelieve that of the plaintiffs. The only exception is the jury finding that Watson, and not Lopez, initiated the arrest of Daniel Ricciuti in the station house; but that finding did not lead to liability, since the jury also permissibly found that Watson had probable cause to arrest Daniel for assault in the third degree.

The jury's evaluations of credibility may usefully be viewed within the larger context of the plaintiffs' theory of the case. Plaintiffs submitted the case to the jury on the theory that after defendant Watson assaulted Alfred Ricciuti without provocation, the three Transit Police defendants (a captain, a lieutenant, and a patrolman) instantaneously and instinctively entered

the evidence that he was maliciously prosecuted or deprived of his right to a fair trial," and that Daniel could not recover on that claim "unless he has proven by a preponderance of the evidence that he was unlawfully arrested, maliciously prosecuted, or deprived of his right to a fair trial." 4/27 Tr. 1238. Because the jury found that plaintiffs had failed to prove actual violations of any federal rights, the conspiracy claims were properly rejected as well.

into a conspiracy with Watson and among themselves to further injure plaintiffs by perjury and fabrication of evidence.

Thus plaintiffs' counsel, opening to the jury, said in part:

[W]e believe the plaintiffs will demonstrate that this case has never been about race or nationality of either the plaintiffs or defendants, but rather about power, power entrusted to law enforcement officials and the abuse of that power.

Plaintiffs will show you that if color is involved in this case at all, the color is neither white nor black, but blue. Plaintiffs will show you that blue is not just the color of the defendants' police uniforms, it's the color of an almost impenetrable blue wall of silence.

Plaintiffs will also show you that blue is the color that bound all those defendants to one another as they combined to deprive the plaintiffs of their civil rights.[61]

In summation, plaintiffs' counsel said in part:

From the outset of this case defendants have sought to cover up their own abuse of power by portraying Alfred Ricciuti as a foul-mouthed person, as a person capable of every type of racial epithet.... [T]he plaintiffs have shown that Lt. Wheeler with the agreement and consent of defendants Lopez or O'Hare and Watson conspired to maliciously prosecute the plaintiffs on false charges of assault in the second degree and aggravated harassment.[62]

In their summations counsel for the several defendants argued, among other things and in varying terms, that plaintiffs' conspiracy theory was inherently implausible. Thus counsel for Wheeler said in part:

But, the allegation is made that the document was created and the document was created as part of a grand conspiracy that miraculously descended upon the plaintiffs and permits them to bring this claim for money damages in this court.

Has anyone suggested to you any believable reason why anyone would conspire against these two individuals, and has anyone ever suggested to you any reason why anyone would fabricate a confession?.... Why would police officers risk their careers to fabricate a document?[63]

Counsel for Watson and O'Hare said in part:

Officer Watson exercised restraint as evidenced by the fact that Alfred really has no injuries at all in this case. He sought out the assistance of the law enforcement machinery. He followed directions. He followed the rules. Officer Lopez, Captain Wheeler, and Inspector O'Hare responded as they were mandated to do by regulations and police procedures in effect. None of these defendants had any reason to cover up or to hide anything.[64]

Counsel for Lopez said in part:

What about Henry Lopez? Why would he get involved in such a conspiracy? There is no proof he knew Mr. Watson. He had been working with [Lieutenant] Wheeler at the time all of six months. Why would they suddenly conspire together?[65]

As Rule 59(a) authorizes and requires, I have considered the trial evidence independently, and share the jury's apparent skepticism regarding plaintiffs' conspiracy theory. The police "blue wall of silence," a distressingly familiar phenomenon invoked by plaintiffs, typically arises when a police officer is charged with misconduct, and other members of his precinct or squad, despite their personal knowledge of the

---

**61.** 4/14 Tr. 5.

**62.** 4/27 Tr. 1160, 1191.

**63.** 4/27 Tr. 1112–1113.

**64.** 4/27 Tr. 1155.

**65.** 4/27 Tr. 1126.

facts, remain mute. That was the setting of the Abner Louima case, except that some officers testified against the police defendants, leading the Mayor and the Police Commissioner to announce the breaching of "the blue wall of silence." In the case at bar, no police officer was charged with misconduct by internal affairs investigators or prosecutors. The Transit Police officers on duty at District 11 on April 30, 1989 found themselves dealing with an altercation between individuals who were total strangers to them: Watson on the one hand, and the Ricciutis on the other. And the police conspiracy the plaintiffs postulate is not the familiar and passive conspiracy of silence, but an active agreement to fabricate evidence by perjured testimony and false documentation. It seems to me inherently unlikely that three Transit Police officers of different ranks (O'Hare a captain, Wheeler a lieutenant, and Lopez a patrolman) would come to an immediate and tacit agreement to frame two strangers, the Ricciutis, in order to benefit a third stranger, Watson.[66]

The other theory of the case, advanced by defendants, is that the plaintiffs performed the acts, and Alfred spoke the words, that Wheeler reported at the time and the defendants testified to at trial. That is at the very least an equally plausible scenario; and, given the plaintiffs' burden of proof, the jury cannot be faulted for adopting it.[67]

For the foregoing reasons, I conclude that (1) plaintiffs have not demonstrated that the jury's verdicts were against the weight of the credible evidence; (2) plaintiffs have not proved by clear and convincing evidence that any defendant committed perjury or fabricated evidence; and (3) plaintiffs have not demonstrated that the jury's verdicts constituted egregious errors or resulted in a miscarriage of justice.

Accordingly the plaintiffs' motion for a new trial is denied in all respects.

It is SO ORDERED.

## APPENDIX A

### SPECIAL VERDICT

#### Liability

Section 1. UNLAWFUL ARREST

**66.** While Watson identified himself to the police defendants as a Corrections Officer, he had no professional contact with Transit Police during the performance of his duties. It is a considerable stretch to argue, as plaintiffs seem to do, that the Transit Police defendants entered into an instantaneous conspiracy to perjure themselves for Watson's sake because they were all "officers."

**67.** This case demonstrates, although no further proof is necessary, that trials are often resolved on the basis of less than certain knowledge. As the Fourth Circuit observed in *Phillips* 556 F.2d at 705, it may occur that neither judges (nor, by extension, jurors) can know with certainty if a particular trial witness perjured himself, or how pervasive that perjury may have been. That someone perjured himself in the case at bar there can be no doubt; for example, either Alfred Ricciuti made the statements Wheeler attributed to him in the written report, or he did not. Alfred and Daniel Ricciuti swore that Alfred never spoke those words; Wheeler and Lopez swore that he did. No one *knows* the truth except those four. The trial judge does not know; the jurors do not know; trial counsel do not know (although on occasion advocates become so wedded to their cause that they speak in tongues of seeming personal knowledge; this case furnishes an example of that phenomenon). And so, in such a case, the parties present their evidence, the judge instructs the jury on plaintiffs' burden of proof, and the jury performs its traditional function of less than omniscient factfinders.

I do not, I hope, violate the constitutional separation of Church and State if I observe that, when these witnesses swore to tell the truth "so help me God," God may indeed have been listening. If that is so, someone ran—indeed, is still running—a risk of the gravest consequences imaginable.

1A. Has plaintiff Daniel Ricciuti proved by a preponderance of the evidence that Defendant Harlise Watson arrested him on April 30, 1989?
_√_ Yes ___ No

If you answered "Yes" to Question 1A, proceed to Question 1B.
If you answered Question 1A "No," answer no further questions under Section 1 or Section 2, and proceed to Section 3.

1B. Has defendant Harlise Watson proved by a preponderance of the evidence that on April 30, 1989 he had probable cause to arrest plaintiff Daniel Ricciuti?
_√_ Yes ___ No

If you answered "Yes" to Question 1B, answer Question 1C, and do not answer Question 1D. If you answered "No" to Question 1B, do not answer Question 1C, and answer Question 1D.

1C. Indicate by (a) check mark(s) for which offense or offenses defendant Harlise Watson had probable cause to arrest Daniel Ricciuti:
___ Assault in the Second Degree
___ Assault in the Third Degree
___ Attempted Assault in the Second Degree
_√_ Attempted Assault in the Third Degree
___ Aggravated Harassment in the Second Degree

1D. Has defendant Harlise Watson proved by a preponderance of the evidence that he is entitled to a defense of qualified immunity in arresting Daniel Ricciuti?
___ Yes ___ No

If you answered "Yes" to Question 1A, and "No" to both Question 1B and 1D, proceed to Section 2 of this Part. Otherwise, proceed to Section 3 of this Part.

### FAILURE TO INTERCEDE

i) Has plaintiff Daniel Ricciuti proved by a preponderance of the evidence that defendant Henry Lopez violated plaintiff's constitutional rights by failing to intercede when defendant Harlise Watson arrested plaintiff?
___ Yes ___ No

(ii) If "Yes," has defendant Henry Lopez proved by a preponderance of the evidence that he is entitled to a defense of qualified immunity for failing to intercede during the arrest of Daniel Ricciuti?
___ Yes ___ No

2B. (i) Has plaintiff Daniel Ricciuti proved by a preponderance of the evidence that defendant Robert L. Wheeler violated plaintiff's constitutional rights by failing to intercede when defendant Harlise Watson arrested plaintiff?
___ Yes ___ No

(ii) If "Yes," has defendant Robert L. Wheeler proved by a preponderance of the evidence that he is entitled to a defense of qualified immunity for failing to intercede during the arrest of Daniel Ricciuti?
___ Yes ___ No

Section 3. MALICIOUS PROSECUTION

3A. Has plaintiff Alfred Ricciuti proved by a preponderance of the evidence that defendant Robert L. Wheeler maliciously prosecuted him for:
(i) assault in the second degree? ___ Yes _√_ No
(ii) aggravated harassment in the second degree? ___ Yes ___ No

3B. Has plaintiff Daniel Ricciuti proved by a preponderance of the evidence that defendant Robert L. Wheeler maliciously prosecuted him for:

(i) assault in the second degree? \_\_\_ Yes \_√\_ No

(ii) aggravated harassment in the second degree? \_\_\_ Yes \_√\_ No

## Section 4. RIGHT TO A FAIR TRIAL

4A. (i) Has plaintiff Alfred Ricciuti proved by a preponderance of the evidence that any of the defendants violated his constitutional right to a fair trial?
\_\_\_ Yes \_√\_No

(ii) If "Yes", indicate by (a) check mark(s) which of the following defendants violated plaintiff Alfred Ricciuti's constitutional right to a fair trial.

a. \_\_\_ Defendant Henry Lopez

b. \_\_\_ Defendant Robert L. Wheeler

c. \_\_\_ Defendant Francis O'Hare

4B. (i) Has plaintiff Daniel Ricciuti proved by a preponderance of the evidence that any of the defendants violated his constitutional right to a fair trial?
\_\_\_ Yes \_√\_ No

(ii) If "Yes", indicate by (a) check mark(s) which of the following defendants violated plaintiff Daniel Ricciuti's constitutional right to fair trial.

a. \_\_\_ Defendant Henry Lopez

b. \_\_\_ Defendant Robert L. Wheeler

c. \_\_\_ Defendant Francis O'Hare

## Section 5. SECTION 1983 CONSPIRACY

5A. (i) Has plaintiff Alfred Ricciuti proved by a preponderance of the evidence that two or more of the defendants acted jointly in concert and that some overt act was done in furtherance of the conspiracy which resulted in a deprivation of plaintiff Alfred Ricciuti's constitutional rights?
\_\_\_ Yes \_√\_ No

(ii) If "Yes", indicate by (a) check mark(s) which of the following defendants were involved in that conspiracy.

a. \_\_\_ Defendant Henry Lopez

b. \_\_\_ Defendant Robert L. Wheeler

c. \_\_\_ Defendant Francis O'Hare

d. \_\_\_ Defendant Harlise Watson

5B. (i) Has plaintiff Daniel Ricciuti proved by a preponderance of the evidence that two or more of the defendants acted jointly in concert and that some overt act was done in furtherance of the conspiracy which resulted in a deprivation of plaintiff Daniel Ricciuti's constitutional rights?
\_\_\_ Yes \_√\_ No

(ii) If "Yes", indicate by (a) check mark(s) which of the following defendants were involved in that conspiracy.

a. \_\_\_ Defendant Henry Lopez

b. \_\_\_ Defendant Robert L. Wheeler

c. \_\_\_ Defendant Francis O'Hare

d. \_\_\_ Defendant Harlise Watson

## Section 6. STATE LAW CLAIMS

6A. Has plaintiff Alfred Ricciuti proved by a preponderance of the evidence that defendant Harlise Watson:

(i) assaulted him? ___ Yes _√_ No
(ii) battered him? ___ Yes ___ No

6B. Has plaintiff Daniel Ricciuti proved by a preponderance of the evidence that defendant Henry Lopez battered him?
___ Yes _√_ No

6C. Has plaintiff Alfred Ricciuti proved by a preponderance of the evidence that defendant Robert L. Wheeler libeled him?
___ Yes _√_ No

6C. Has plaintiff Alfred Ricciuti proved by a preponderance of the evidence that defendant Robert L. Wheeler libeled him?
_____ Yes _____ No

## OPINION DENYING REARGUMENT

On September 20, 1999, this Court entered an Opinion and Order denying plaintiffs' motion for a new trial pursuant to Rule 59, Fed.R.Civ.P. On September 30, 1999, plaintiffs filed a timely motion for reconsideration and reargument pursuant to Local Civil Rule 6.3. On October 20, 1999, while that motion was *sub judice,* plaintiffs filed a notice of appeal from this Court's September 20, 1999 Opinion and Order.

### I

I raise *sua sponte* the question whether plaintiffs' notice of appeal ousted this Court of jurisdiction to decide their pending motion for reargument. Having posed the question, I answer it in the negative.

 A notice of appeal divests the district court of jurisdiction to consider all issues related to the matter on appeal, "except insofar as [jurisdiction] is reserved to it explicitly by statute or rule." *Toliver v. County of Sullivan,* 957 F.2d 47, 49 (2d Cir.1992) (internal quotation marks and citation omitted). Rule 4(a)(4)(A), Fed. R.App.P., lists a number of post-trial or post-judgment motions which, if timely filed in the district court, cause the time to appeal to run from the entry of the order "disposing of the last such remaining motion." One of these designated motions is a motion "for a new trial under Rule 59." Rule 4(a)(4)(A)(v). If a party files a notice of appeal during the pendency of a motion or motions listed in Rule 4(a)(4)(A), the notice of appeal "becomes effective to appeal a judgment or order, in whole or in part, when the order disposing of the last such remaining motion is entered." Rule 4(a)(4)(B)(i). The operation of Rule 4(a)(4) causes an initial notice of appeal to be suspended "during the pendency of post-trial motions and then become effective upon the final disposition of such motions." *Weinstock v. Cleary, Gottlieb, Steen & Hamilton,* 16 F.3d 501, 503 (2d Cir.1994). *Cf. United States v. Ibarra,* 502 U.S. 1, 6, 112 S.Ct. 4, 116 L.Ed.2d 1 (1991) (rule treating petitions for rehearing as rendering the judgment non-final for purposes of appeal during the pendency of the petition gives district courts "the opportunity to correct their own alleged errors, and allowing them to do so prevents unnecessary burdens being placed on the courts of appeals").

 While App. Rule 4(a)(4)(A) does not specifically include motions for reargument filed under local civil rules, the Second Circuit regards them as the functional equivalent of motions to alter or amend the judgment pursuant to Civ. Rule 59(e), and therefore among the motions that suspend appellate jurisdiction. *See, e.g., Lowrance v. Achtyl,* 20 F.3d 529, 533 (2d Cir. 1994); *McCowan v. Sears, Roebuck and Co.,* 908 F.2d 1099, 1103–04 (2d Cir.1990).

Since plaintiffs timely filed their motion for reconsideration of this Court's denial of Rule 59 relief, these authorities serve to suspend appellate jurisdiction, notwithstanding plaintiffs' filing of a notice of appeal. This Court accordingly retains jurisdiction to consider the motion for reargument on its merits.

## II

Familiarity with the Court's opinion dated September 15, 1999 (the "Opinion") denying plaintiffs' motion for a new trial is assumed. The Opinion declined to disturb the jury's verdicts dismissing all plaintiffs' claims, asserted by one or both plaintiffs against one or several defendants.

On the present motion for reargument, plaintiffs limit their contentions to plaintiff Daniel Ricciuti's false arrest claim against defendant Watson, *see* affirmation of Kathleen M. O'Connell, Esq., counsel for plaintiffs, at 2–15, and both plaintiffs' malicious prosecution claims against defendant Wheeler, *id.* at 15–25. The Opinion's denial of plaintiffs' Rule 59 motion with respect to the jury's verdicts rejecting the other claims is not implicated by the motion for reargument.

 Plaintiffs' motion for reargument is governed by Local Civil Rule 6.3 (1997), which requires in part that on such a motion "[t]here shall be served with the notice of motion a memorandum setting forth concisely the matters or controlling decisions which counsel believes the court has overlooked." Counsel for Wheeler points out that plaintiffs' submission on this motion is supported by their attorney's affirmation, unaccompanied by a memorandum of law, and argues that the motion should accordingly be denied for

failure to comply with the rule. I disagree.

Rule 6.3 requires a motion for reargument to be accompanied by a "memorandum," not a "memorandum of law." When the drafters of the rules wished to require a memorandum of law, the knew how to say so; *cf.* Local Civil Rule 7.1 ("all motions and all oppositions thereto shall be supported by a memorandum of law, setting forth the points and authorities relied upon"). The O'Connell affirmation satisfies Rule 6.3's requirement of a "memorandum," although the paucity of citations to authorities reduces plaintiffs to arguing that the Court overlooked factual "matters," rather than "controlling decisions" of law.[1]

 The deficiencies of plaintiffs' motion for reargument lie in its substance, rather than its form. The substantive requirements of Rule 6.3 are carefully crafted to limit motions for reargument; they function as a rule of repose. Motions for reargument "are granted when new facts come to light or when it appears that controlling precedents were overlooked." *Weissman v. Fruchtman,* 658 F.Supp. 547, 548 (S.D.N.Y.1987) (Leisure, *J.*). "The proponent of such a motion is not supposed to treat the court's initial decision as the opening of a dialogue in which that party may then use Rule 3(j)[2] to advance new facts and theories in response to the court's rulings." *McMahan & Co. v. Donaldson, Lufkin & Jenrette Securities Corp.,* 727 F.Supp. 833 (S.D.N.Y.1989) (Mukasey, *J.*). The purpose of the rule is "to ensure the finality of decisions and to prevent the practice of a losing party examining a decision and then plugging the gaps of a lost motion with additional matters." *Lewis v. New York Telephone,* No.

---

1. The only case cited in the O'Connell affirmation, at 22, is *Lowth v. Town of Cheektowaga,* 82 F.3d 563 (2d Cir.1996), which counsel identifies as a source for the Court's charge to the jury on the element of malice in a claim for malicious prosecution. It cannot be said that the Opinion entirely "overlooked" *Lowth,* since it cited and applied the case at pages

51–52 and 55. Nor do I understand plaintiffs to be arguing on this motion that *Lowth* did not support the charge given, or that the Court misapplied the case in its Opinion.

2. Local Civil Rule 3(j) is the source for present Rule 6.3. The language did not change.

83 Civ. 7129, 1986 WL 1441 (S.D.N.Y. Jan. 29, 1986) (Sweet, J.).

■ The present plaintiffs' motion entirely fails to meet these substantive standards. As noted, there is not even an effort to point to controlling precedents that the Opinion overlooked. The submission of counsel on reargument falls into the same pattern displayed by plaintiffs' original motion under Rule 59: selective quotations from the trial record, the omission of contrary or explanatory testimony adduced by the defense, and a disregard of the jury's paramount role in resolving fact issues that turn upon the witnesses' credibility.

One contention plaintiffs make on the present motion requires comment. Counsel's affirmation at 22–23 quotes the Court's charge to the jury on the element of malice in a claim for malicious prosecution, and then says:

> Plaintiff [*sic*] submits that the Court overlooked the fact that in this case, the jury was clearly required to infer malice from Lt. Wheeler's lack of probable cause to charge assault second.

It is difficult to know what to make of this contention, whose introductory phrase is cast in terms of a overlooked *fact*, but concludes by stating that "the jury was clearly *required* to infer malice," which sounds more like an argument that plaintiffs were entitled to an instruction that they had established Wheeler's malice as a matter of law.

■ Whatever the thrust of this contention, it is problematic. If *au fond* plaintiffs are complaining about the Court's instruction, the contention comes too late, since they did not object to the charge as delivered and did not require any additional or further language. In any event, malice, like intent, is a state of mind, and when in dispute is traditionally left to the jury to decide, on the basis of the evidence, direct or circumstantial, from which an individual's relevant state of mind may or may not be inferred. In the

case at bar, Wheeler denied that he had acted with malice toward the plaintiffs, and articulated to the jury an explanation for his charging them with assault in the second degree. *See* Opinion at 53 (quoting Wheeler's trial testimony). Plaintiffs did not request at the trial an instruction in their favor taking this issue from the jury, and they are not entitled to post-trial relief from the jury's verdict, for the reasons sufficiently stated in the prior Opinion at 55–76 (including an analysis of Wheeler's alleged perjury at trial as a basis for inferring malice).

Plaintiffs' motion for reargument, having been considered on the merits, and no merit being discerned, is denied.

It is So Ordered.